**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff-Appellee Cross Appellant,**

v.

**LOUISIANA NATIONAL BANK, Defendant-Appellant Cross Appellee.**

No. 80–3147.

United States Court of Appeals,
Fifth Circuit.
Unit A

Aug. 14, 1981.

Frederick R. Tulley, Baton Rouge, La., for defendant-appellant, cross appellee.

Barham & Churchill, Earl S. Eichin, Jr., Charles F. Thensted, New Orleans, La., for plaintiff-appellee cross appellant.

Before BROWN, WISDOM and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

This case presents the question whether the district court was clearly erroneous when, following a bench trial, it held that the declaration of a dividend on September 9, 1974, by International City Bank and Trust Company (ICB) did not create an event of default under section 4 of the Note Agreement dated March 15, 1972 (the Note Agreement), executed by ICB, which sets forth the terms and conditions under which $5,000,000 aggregate principal amount of Senior Capital Notes—Series A (the Notes)

were issued by ICB. Section 4 of the Note Agreement provides that so long as any Notes are outstanding, ICB "shall not declare any dividends on its Common Stock unless, at the date of such declaration, in the case of a dividend the aggregate amount of all such dividends declared or made after April 1, 1972 would not exceed the net profits of [ICB] earned after April 1, 1972." Louisiana National Bank of Baton Rouge (LNB), a holder of $500,000 principal amount of the Notes, took the position that an event of default had occurred through the declaration and payment of dividends; declared the principal of and accrued interest on the Notes held by it to be due and payable in May, 1976; and subsequently (in December, 1976) set off accounts of ICB with LNB, with deposits aggregating $323,924.34, in order partially to recoup the amount owing to LNB by ICB on such Notes. LNB's position was based on the premise that the internal financial statements of ICB which were available to the Board of Directors of ICB when the September dividend was declared were not prepared in accordance with generally accepted accounting principles and failed to present fairly the amount of dividends that had actually been declared or paid after April 1, 1972, and the amount of net profits of ICB that had actually been earned after April 1, 1972, and on the further premise that if appropriate adjustments were made, both in the amount of dividends declared and in the amount of net profits earned, the declaration of the September dividend created an event of default under section 4. The district court held that the financial statements presented to the Board of ICB at the time that the September dividend was declared were "appropriate" and that since such financial statements reflected that sufficient net profits were available for the payment of dividends, no default had occurred by reason of the declaration of the September dividend. Based upon our review of the record, we hold that the district court was clearly erroneous in holding that the financial statements of ICB available to the Board at the time of the declaration of the September dividend were "ap-

propriate" and in refusing to give effect to certain adjustments which were required in order to compute, in accordance with generally accepted accounting principles, the aggregate amount of dividends that had been declared or paid since April 1, 1972. If such adjustments are made, the total amount of dividends declared and paid by ICB during the period from April 1, 1972, through September 9, 1974, exceeded the net profits earned during the same period, and a default under section 4 of the Note Agreement was created by the declaration of the September 9 dividend. We reverse and remand to the district court for entry of an order granting judgment to LNB.

## I. THE FACTS

ICB was a bank chartered under the laws of the State of Louisiana. All the outstanding capital stock of ICB (other than directors' qualifying shares) was owned by The ICB Corporation (ICB Corporation). Early in 1972, ICB issued and sold $5,000,000 aggregate principal amount of the Notes, of which $500,000 were purchased by LNB. Section 4 of the Note Agreement pursuant to which the Notes were issued, which is quoted above, was designed to limit the dividends declared by ICB after April 1, 1972, to the net profits earned by ICB after that date.

Financial information of ICB presented at trial reflected net profits of ICB for the period from April 1, 1972, through December 31, 1973, of $1,342,152. After 1973, however, the profitability of ICB took a decided turn for the worse. The audited financial statements for ICB for the years ended December 31, 1974, and 1975, reflect net losses of $1,625,959 and $424,829, respectively. In late March of 1976, the financial condition of ICB was called to the attention of officers of LNB, and on May 4, 1976, LNB sent a letter to ICB (corrected by a letter dated May 7, 1976) stating that in the opinion of LNB an event of default had occurred through the declaration and payment of dividends and declaring the principal and accrued interest on the Notes held by LNB to be immediately due and payable.

Although the letter requested ICB to make the necessary arrangements to pay the Notes not later than May 14, 1976, no action was taken by ICB in response to the letter.

On December 3, 1976, the Commissioner of Financial Institutions of the State of Louisiana closed ICB upon finding that ICB was in an unsafe and unsound condition to transact a banking business and tendered the receivership of ICB to the Federal Deposit Insurance Corporation (FDIC). Also on that date certain assets of ICB were transferred to Bank of New Orleans and Trust Company and other assets (including the deposits at issue in this case) were transferred to the FDIC. On December 6, 1976, LNB set off deposits of ICB with LNB totalling $323,924.34 in order partially to recoup the amount owing by ICB to LNB on the Notes.

## II. PROCEEDINGS BELOW

In May of 1977, the FDIC filed this suit against LNB seeking to recover the amount of the deposits formerly owned by ICB which LNB had set off on December 6, 1976. The principal contested issue during the early stages of this litigation revolved around section 3 of the Note Agreement which provides that the payment of principal and interest on the Notes is subordinated in right of payment to the prior payment in full of all indebtedness, obligations and liabilities, including deposits, of ICB. In a motion for summary judgment, the FDIC took the position that at all times during the period from April 1, 1972 to December 3, 1976, there existed unpaid indebtedness, obligations and liabilities, including deposits, of ICB and that neither ICB nor the FDIC was in a position to pay all creditors of ICB in full. That being the case, the FDIC argued that the subordination provision of the Note Agreement would preclude LNB from, in effect, employing a set off to pay down the indebtedness on the Notes held by it. The FDIC also asserted that no demand or notice of demand for set off was given by LNB to ICB at any time prior to or on December 3, 1976, the date ICB was declared insolvent, and that LNB could not

exercise its right of set off after that date. On March 13, 1979, the district court denied the FDIC's motion for summary judgment. The court held that if, in fact, ICB had defaulted on the Notes held by LNB prior to the closing of ICB by the Commissioner of Financial Institutions and if, in fact, ICB was "properly placed in default prior to the closing of [ICB]," then the subordination provision of the Note Agreement would not prevent LNB from demanding payment on the Notes and LNB, pursuant to the provisions of its depositor's agreement with ICB, had a legal right to set off ICB's accounts in LNB to recover money due under the notes. The court concluded that the only two issues remaining in the case were whether an event of default had occurred under the Notes and whether ICB was properly placed in default prior to the closing of ICB, and the court set those issues for trial. The FDIC has not appealed from the district court's rulings on the subordination and right of set off issues and we express no opinion with respect to the correctness of those rulings.

Following the trial, the district court ruled that the September, 1974 dividend did not constitute an event of default under section 4 of the Note Agreement. The court began its opinion by noting that the net profits of ICB for the period from April 1, 1972, through December 31, 1973, were $1,342,152, and that the total cash dividends for the same period were $1,162,784, leaving $179,368 in net profits available at the beginning of 1974 from which dividends could be declared without precipitating a default under section 4 of the Note Agreement. The court focused first on a challenge by LNB to the computation of the total amount of dividends declared and paid by ICB during the period from April 1, 1972, through September 9, 1974, and then on a challenge by LNB to the computation of the total net profits of ICB for the same period. The transactions challenged by LNB as affecting the computation of the total amount of dividends declared consisted of a series of cash purchases of securities by ICB from ICB Corporation, during the months of April, July and August, 1974, at prices in

excess of the fair market values of the securities. Each such security was carried on the books of ICB at cost, rather than at its fair market value, throughout the period beginning on the date of purchase of such security and ending at some point in late 1974 or early 1975. The total cost of the securities purchased by ICB from its parent exceeded the aggregate fair market value of such securities by more than $700,000. The district court stated that Touche Ross & Co. (Touche Ross), certified public accountants for ICB, treated the amount of that excess as a loan, whereas Ernst & Whinney, certified public accountants employed by LNB to review these transactions, among others, were of the view that the excess should have been treated as a dividend. If the securities purchase transactions had been accounted for by ICB as a dividend, the sum of the amount of that dividend (approximately $700,000) and the amount of the cash dividends declared by ICB from April 1, 1972, through September 9, 1974 ($1,162,784) would have exceeded the sum of the net profits from April 1, 1972, through December 31, 1973 ($1,342,-152) and the net profits from January 1, 1974, through August, 1974, reflected on the financial statements of ICB presented to the September, 1974 Board meeting ($218,-000) by more than $300,000, and a default under section 4 would clearly have occurred when the September dividend was declared. The district court made no effort to determine on the basis of the evidence before it whether the method employed by ICB for recording the securities purchase transactions on its books was in accordance with generally accepted accounting principles. Instead, the court concluded as follows:

> The evidence adduced at trial established that as of September 9, 1974, the date when the Board of Directors for ICB declared the dividend, they had not violated paragraph 4 of the Note Agreement. That is, to the best of their knowledge, and with the appropriate financial statements to aid them, the ICB Board of Directors determined that they had excess profits and paid out a portion of those profits in dividends. According to the minutes of the meeting held on September 9, 1974, the Board of Directors unanimously approved a regular quarterly dividend of $.107 per share.... This court concludes that on the date when the dividend was declared there was no violation of the dividend covenant. Therefore, no default under the terms of the Note Agreement.

The district court went on to consider whether net profits for the period from April 1, 1972, through September 9, 1974, should be reduced by $1,500,000, the amount of an increase in ICB's reserve for loan losses that was required by the FDIC as a result of an examination commenced on October 11, 1974, and was recorded in the financial statements of ICB as of September 30, 1974. If the district court had accepted LNB's contention that generally accepted accounting principles required that the increase in loan loss reserves be booked as early as September 9, 1974, then the net profits of ICB from April 1, 1972, through September 9, 1974, would have been obliterated and the September dividend clearly would have violated section 4 of the Note Agreement. The district court rejected LNB's contention and determined to take what it termed a straight "chronological approach" to the ICB dividend situation. Under that approach, the Court held that no violation had occurred at the time of the declaration of the September dividend which would have caused ICB to be in default under section 4. The court noted that the FDIC examination which precipitated the increase in loan loss reserves had occurred approximately five weeks after the date of the September board meeting at which the dividend was declared. The court held that on the basis of the financial statements actually before the Board at the September meeting, net profits were available for the declaration of dividends.

Having concluded that the financial statements actually before the Board at the time the September dividend was declared were "appropriate" and reflected that net profits were available for the payment of dividends, the court held that no default

had been occasioned by the declaration of the September dividend under the terms of section 4 of the Note Agreement and entered judgment for the FDIC in the amount of $323,924.34.

## III. THE STANDARD TO BE APPLIED UNDER SECTION 4

■ As a threshold matter, we are called upon to consider the correctness of the district court's position that the propriety of the September dividend should be judged by the financial statements actually before the Board of ICB at the September meeting. The district court seems to have taken the position that the matter of whether the dividends violated section 4 of the Note Agreement should be determined by whether they were declared in good faith or under the reasonable belief that the financial statements relied upon by the Board were accurate. LNB argues, on appeal, that the Note Agreement does not contemplate such a standard in determining the propriety of the declaration of the dividend. Section 4 of the Note Agreement states that ICB "shall not declare any dividends . . ." unless "the aggregate amount of all such dividends declared or made after April 1, 1972 would not exceed the net profits of [ICB] earned after April 1, 1972." On its face, section 4 creates an objective standard for determining whether dividends may be declared, which turns on the amount of dividends "declared or made" subsequent to April 1, 1972, and on net profits earned subsequent to such date, as distinguished from the subjective, good faith standard on which the district court seems to have relied. Financial covenants in loan agreements, such as the dividend restriction at issue in this case, normally create tests for determining the propriety of certain corporate action affecting the financial position of the borrower which are to be applied to financial statements of the borrower prepared in accordance with generally accepted accounting principles consistently maintained. There is no suggestion in the Note Agreement at issue here that the propriety of any dividend declared by ICB should be determined in any other manner. Further,

the Notes were offered and sold pursuant to the terms of an Offering Circular which contained complete financial statements for ICB at December 31, 1971, and for the year then ended, accompanied by the report of Touche Ross to the effect that such financial statements had been prepared in accordance with generally accepted accounting principles and fairly presented the financial position of ICB at December 31, 1971, and the results of its operations and changes in financial position for the year then ended, in conformity with generally accepted accounting principles applied on a consistent basis with that of the preceding year. It would be anomalous indeed to apply to the determination of the propriety of the September dividend a standard with respect to the financial statements on which that dividend is based which is different from that employed in the financial statements included in the Offering Circular pursuant to which the Notes were issued and sold. We hold, therefore, that the district court was in error to the extent that its holding and opinion are based upon the notion that the September dividend is to be judged on the basis of whether it was declared in good faith or under the reasonable belief that the financial statements relied upon by the Board were accurate. The test to be applied under section 4 in determining the propriety of the September dividend is whether there were net profits subsequent to April 1, 1972, in excess of dividends "declared or made" subsequent to that date, and in determining the amount of net profits and the amount of dividends declared and made, generally accepted accounting principles must be applied. Any adjustments required by those principles to the net profits and dividends declared, as reflected in the financial statements presented to the Board at the September meeting, must be made before the propriety of the September dividend can be determined.

The matter of how the "aggregate amount of all such dividends declared or made after April 1, 1972" should be computed requires one further caveat. The district court treated the allegation made by LNB

relating to the securities purchase transactions as "a disagreement over the classification of the type of 'accounting' transaction which should have been used ..." The FDIC, in its brief on appeal, firmly agrees [1] with that characterization but goes on to argue that LNB failed to offer any evidence which could or did establish that section 4 was violated. Because the parties have treated the ultimate issue in this case—whether ICB was in default under section 4—as a controversy over the proper accounting treatment of certain transactions, there seems to be no dispute between the parties that it is the accounting treatment of the securities purchase transactions which determines whether those transactions are "dividends" within the meaning of section 4. We pretermit, therefore, any consideration of whether, as a general rule, the phrase "dividends declared or made" should be construed in a narrower fashion to include only those dividends actually declared by the Board of ICB and denominated as such.

## IV. THE EVIDENCE AT TRIAL

At trial and on appeal, LNB argued that adjustments should be made both in the computation of net profits for the period beginning on April 1, 1972, and ended on the date of the declaration of the September dividend and in the computation of the aggregate amount of dividends declared and made during the same period if such net profits and dividends are to be computed in accordance with generally accepted accounting principles. We turn then to the question whether the district judge was clearly erroneous in holding that the financial statements of ICB available to the Board at the time of the declaration of the September dividend were "appropriate" and in refusing to give effect to the adjustments proposed by LNB. Fortunately, it is not necessary for us to address both the net profits computation and the aggregate amount of dividends declared and paid computation since, as indicated above, if either computation was in error, the declaration of the September dividend did create an event of default under section 4 of the Note Agreement. We have elected to consider the evidence adduced at trial relating to the propriety, under generally accepted accounting principles, of the manner in which the aggregate amount of dividends declared and paid during the period beginning on April 1, 1972 and ended on the date of the declaration of the September dividend, was computed.

We note that LNB acknowledged at trial that it had the burden of proving the existence of the default under section 4 of the Note Agreement and the adequacy of method employed by LNB to declare the default by a preponderance of the evidence.

The trial began badly, insofar as LNB was concerned, when the district court, following an objection by counsel for the FDIC, refused to admit the testimony of William Coe, a certified public accountant employed by Ernst & Whinney to examine certain transactions to which ICB was a party, together with certain books and records of ICB, with a view to determining whether those transactions were reflected on the books and in the financial statements of ICB in accordance with generally accepted accounting principles. The ultimate objective was to determine whether any dividend declared by ICB during the period

---

1. The FDIC's brief on appeal states:

The point is, as stated by Judge West, that *this case involves nothing more than "... a disagreement over the classification of the type of 'accounting' transaction which should have been used in a previous ICB bookkeeping entry."* (Findings and Conclusions R. p. 285, emphasis supplied). That disagreement was correctly resolved, because LNB failed to offer any evidence which could or did establish by a preponderance that the capital note agreement was violated by ICB.

FDIC's Brief on Appeal at 7.

The FDIC's position—that this case involves nothing more than a disagreement over proper accounting—makes incomprehensible the position taken by the FDIC on page 12 of its brief on appeal:

Under the circumstances, FDIC does not believe that any useful purpose will be served by going through and rebutting point-by-point each of the convoluted accounting arguments raised in LNB's brief.

FDIC's Brief on Appeal at 12.

from April 1, 1972, through September 30, 1974, exceeded the net profits of ICB for the same period in violation of section 4 of the Note Agreement. LNB proffered a report by Ernst & Whinney on its project which the court similarly refused to admit into evidence. There were two reasons expressed by the district court for its refusal to admit the testimony of Mr. Coe and the report of Ernst & Whinney. The first was on the basis of unfair surprise in that Mr. Coe was preparing to express an opinion as to the way in which certain transactions should have been recorded after having disclaimed, in a prior draft of the report, an ability to express an opinion. The second reason, which is related to the first, is that the report of Ernst & Whinney contains a disclaimer to the effect that because the procedures employed by Ernst & Whinney in carrying out its assignment were not sufficient to constitute an examination made in accordance with generally accepted auditing standards, the firm did not express an opinion on net income, dividends declared or other specific accounts of ICB referred to in the report. Counsel for LNB called to the court's attention the fact that Mr. Coe and Ernst & Whinney *were* prepared to express an opinion as to how certain transactions to which ICB was a party should have been reported, but the court ruled that such a limited opinion was not adequate. At the conclusion of the trial, however, the district court appears to have changed its mind and permitted Mr. Coe to testify regarding his opinion of the proper method of recording two major groups of transactions at issue in the case, including the securities purchase transactions.

On appeal, LNB argues that the exclusion by the district court of the testimony of Mr. Coe was prejudicial error. LNB argues that counsel for the FDIC was furnished a copy of the preliminary draft of the report of Ernst & Whinney four months before the trial. LNB argues further that, quite apart from the question of whether there was in fact surprise, a ruling based on this ground cannot be sustained under Rule 403 of the Federal Rules of Evidence. Finally, LNB argues that Mr. Coe was prepared to express an opinion on the manner in which certain transactions should have been recorded and presented for financial statement purposes. Fortunately we need not address LNB's arguments with respect to the propriety of the district judge's ruling on the admission of the testimony of Mr. Coe and the report of Ernst & Whinney because the evidence that was admitted during the course of the trial demonstrates that the district court was clearly erroneous in concluding that no default under section 4 of the Note Agreement had been occasioned by the September dividend.

Being unable to present testimony from its own expert, LNB called a certified public accountant employed by Touche Ross, L. Guy Cook, who participated in the annual audits of ICB Corporation and ICB by Touche Ross throughout the period involved in this case. Mr. Cook began by identifying a work paper prepared by another employee of Touche Ross in February, 1975 in connection with the audit of the financial statements of ICB Corporation and ICB as of December 31, 1974, entitled "ICB●T—Computation of Earnings After 4/1/72–12/31/74," which was introduced into evidence by LNB. The work paper reflected net profits for the period from April 1, 1972, through December 31, 1973, of $1,342,-152. The same work paper, together with testimony thereon by Mr. Cook, reflected *cash* dividends declared during the period beginning on April 1, 1972, and ended with the September, 1974 dividend in question in this litigation totalling $1,162,784.

After establishing the amount of net profits for the period from April 1, 1972 through December 31, 1973, and the amount of cash dividends declared for the period from April 1, 1972, through September 9, 1974, Mr. Cook testified extensively about the increase of $1,500,000 in the provision for loan losses which was made in November, 1974, effective as of September 30, 1974. This testimony was directed towards determining the propriety, in accordance with generally accepted accounting principles, of the provision for loan losses contained in the financial statements presented

to the Board of ICB at the September, 1974 meeting. Since the question whether the declaration of the September dividend violated section 4 of the Note Agreement can be resolved solely by considering the propriety of the manner in which the securities purchase transactions were recorded, we need not consider Mr. Cook's testimony on the provision for loan losses.

Mr. Cook's attention was then directed to a report of the FDIC setting forth the results of its examination of ICB which commenced on October 11, 1974, specifically to page 3A of that report dealing with "Adversely Classified Securities." Mr. Cook testified that in that report four groups of securities purchased by ICB from ICB Corporation were classified by the FDIC as a loss, and the total loss classification with respect to those securities was $789,688. He testified further that the amount of the loss was determined by computing the difference between the cost and current market value of the securities. In response to a question from LNB's counsel as to whether it was a normal transaction for a bank to buy securities for $789,000 more than the market price, Mr. Cook testified that it was not. Counsel for LNB then asked Mr. Cook whether the $789,000, which related to transactions with ICB Corporation which had taken place before the September board meeting, should be added to the loss of ICB as of September 30, 1974. Mr. Cook's response, which is quite revealing, is that the transaction was "not a completed transaction." When asked to explain that response, Mr. Cook testified as follows:

Q   Could you explain?

A   When we performed our audit procedures, primarily during the fourth quarter of 1974, we became aware of the fact that the corporation had transferred—had purchased—the bank had purchased certain securities from the corporation in excess of market value. We informed the corporation at this time that this was an incorrect accounting transaction and they ultimately determined that in order to make the bank whole that

they would repurchase these securities and that is what they agreed to do prior to end of 1974.

Q   From what you're telling me, the bank and the holding company originally structured this transaction as a purchase by the bank of securities at a price $789,000 in excess of market, is that correct?

A   Well, I don't agree with these numbers that are in here, I don't think; but basically—

Q   Generally—

A   —it was in excess of market.

Q   That is the way the transaction was structured at the time? Is that correct?

A   Yes, sir.

Following a recess, Mr. Cook testified further as to the proper accounting treatment of the securities purchase transactions:

Q   Mr. Cook, we were talking before we broke about certain securities which were sold in the summer of 1974 by the bank to its holding company at cost some seven hundred thousand dollars in excess of market—at a price in excess of market. Do you recall that discussion?

A   Yes, sir.

Q   Okay. And you recall that the FDIC examiners suggested that the difference between market value and the price paid by the bank was classified as a loss?

A   In their report, yes, sir.

Also I'd like to point out. I don't agree with their numbers.

Q   Is it a material difference?

A   The real numbers I think are about half of what their numbers are.

Q   Before I get into what the real numbers are, let's assume that the FDIC's numbers are correct. How, in your opinion should that transaction have been accounted for as of September 30, 1974?

A  I wasn't asked to account for it as of September 30, 1974.

Q  How should it have been accounted for at the time the transactions occurred in the summer of 1974?

A  It depends on what the intent of the parties was.

Q  Well, I think you testified that according to the examination report, the intent was to sell securities.

A  Yes, sir.

Q  Under generally accepted accounting principles, how should such a transaction be accounted for at the time of the transaction where a parent buys securities or other assets at a price—I mean sells assets to its subsidiary at a price far in excess of market?

A  At the time we did our examination during the third quarter of 1974, we informed—we reviewed these transactions and had discussions with the client concerning the method in which they sold these securities. At that time we advised them that we did not consider the accounting treatment that they accorded this—Let me say we did not consider the sales price that they had used in determining the sale was adequate or correct. We advised them that they should undo the transaction or they could be faced with the possibility of having to record a dividend.

Q  Either you undo the transaction or it's a dividend, is that correct?

A  Yes, sir.
   Those are two possible alternatives. There may be others.

Q  Those are the two you're familiar with?

A  Yes, sir.

Q  As of the time of the transaction, the summer of 1974, now, this is prior to the September 30 event that we've been talking about, it was at your suggestion that the bank either undo this transaction or report it as a dividend? Is that correct?

A  We offered those as possible alternatives.

Q  But did the bank record it as a dividend?

A  No, they did not.

Q  Did they undo the transaction?

A  Yes, they did.

Q  When?

A  They agreed to repurchase the securities from the bank at the original selling price. They set up a receivable and they quoted this transaction as a year end adjustment. They set up a receivable and—a payable and recorded the securities—The bank set up a receivable and the money was actually paid to the bank in '75 after the end of the year.

Q  This adjustment was made at year end 1974, was it not?

A  That's correct.

Following that testimony, counsel for LNB asked Mr. Cook to identify a memorandum to the files regarding Touche Ross's audit of ICB for 1974. Mr. Cook acknowledged that he had prepared the memorandum. Turning to the section of the memorandum dealing with the securities purchase transactions, Mr. Cook acknowledged that the memorandum indicated that an adjustment to the manner in which the securities purchase transactions were originally recorded on the books of ICB would require the recording of capital contributions and dividends and that such transactions had not been approved by the Board of Directors of ICB or ICB Corporation. When asked what that meant, Mr. Cook testified as follows:

Q  What did you mean when you wrote that?

A  Well, this is saying that if the bank was determined to sell these at the original cost not the current market, the entry would have to be made to record a capital contribution and a dividend.

Q  In other words, if you were to view the transaction as it was originally structured in the summer of 1974,

generally accepted accounting principles would require you to consider the difference between market and cost as a dividend paid in the summer of 1974, would it not?

A   If it was the intent of the parties to create a dividend, in that manner, yes.

Q   The financial records of the ICB did not treat it as a dividend, did they?

A   No, they did not.

Q   And Touche Ross' opinion did not treat it as a dividend, did they?

A   The financial statement which was published at the end of the year did not treat it as a dividend.

Q   What about the financial statement contained in that 10 Q as of September 30, 1974?

A   It did not treat it as a dividend.

Q   How was it treated?  How?

A   It was treated as a sale of securities to—from the corporation to the bank.

Q   It was not treated as a loan?

A   I doubt it.  I'm not sure what's in the books at September 30.

Q   What about the 1974 annual report?

A   The '74 annual report is.

Q   Treats it as how?

A   Treats it as a loan.

Q   And that is how you suggested treating it in this memo that you're writing, do you not?

A   That's right.  That is how we felt was the perfect accounting treatment if that was the intent of the parties.

Q   Okay.  Read further at the bottom of the second paragraph of page two. In addition there was a question of whether or not the bank could legally record an additional dividend at this time due to the capital note restriction.

A   That's correct.

Q   Are you telling me that one of the factors which made the bank and its accountant decide to record this is as a loan and not a dividend was by virtue of the fact that to record it as a dividend would have violated the dividend restriction covenant?

A   The bank—the management of the bank certainly did not want to violate the dividend restrictions of the covenant.  They had no intention to violate the dividend restrictions of the covenant.

Q   And so that's why it was recorded as a loan and not a dividend?

A   I'm sure that is one of their considerations.

Mr. Cook's attention was then directed to a memorandum from Touche Ross's technical center in Chicago to a member of the staff of Touche Ross's New Orleans office and to the FDIC examination report as of October 11, 1974.  The memorandum from the technical center is addressed to the propriety of treating the securities purchase transactions as a loan from ICB Corporation to ICB rather than as a sale of securities.  One of the matters addressed in the technical memorandum is whether treating the securities purchase transactions as a loan would be in accordance with the applicable banking regulations.  When asked whether Touche Ross had taken into consideration, in accounting for the securities purchase transaction as a loan rather than as a dividend, the question whether the loan may have been in violation of federal banking laws, Mr. Cook replied that it was up to ICB to determine whether it was in violation of law.  Turning to the FDIC examination report, Mr. Cook conceded that the report reflected that treating the securities purchase transactions as a loan would result in a violation of the limitation on the aggregate amount of loans to affiliates set forth in the banking laws.

At the conclusion of Mr. Cook's testimony, counsel for LNB asked Mr. Cook whether he knew of any study which was made to determine whether the dividend declared in September, 1974 violated section 4.  He testified that other than the portion of Touche Ross's annual audit work papers which had been introduced into evidence, he did not know of any such study.  Specifically he

testified that: "No study was done in September." In response to the inquiry whether the question of a violation occurring under the dividend restriction covenant was ever posed to Touche Ross, his response was: "No."

It was at this point that Mr. Cook was tendered by counsel for LNB to counsel for the FDIC. Before we review Mr. Cook's testimony on cross examination, it might be helpful if we summarize his direct testimony.

(1) During the months of April, July and August, 1974, ICB purchased securities from ICB Corporation at prices, in the aggregate, more than $700,000 in excess of the fair market values of the securities.

(2) Each such security was carried on the books of ICB at cost, during the period beginning on the date of purchase of such security and ending in late 1974 or early 1975, when, in connection with the audit of ICB and ICB Corporation by Touche Ross, the "purchase" was restructured as a loan.

(3) In the third or fourth quarter of 1974, representatives of Touche Ross advised ICB that the method by which the securities purchase transactions were originally recorded on the books of ICB was not proper and that unless the transactions were restructured, they would have to be recorded as a dividend.

(4) In connection with Touche Ross's audit of the financial statements of ICB and ICB Corporation at December 31, 1974, Touche Ross reviewed the compliance by ICB with section 4 of the Note Agreement. Touche Ross did not make any review in September or as of the date of the September 9 board meeting in order to determine such compliance.

■ It is clear from Mr. Cook's direct testimony, therefore, that at the date of the September Board meeting, the securities purchase transactions were not recorded on the books of ICB or reflected in the financial statements of ICB in accordance with generally accepted accounting principles. If the transactions had been recorded prop-erly at that date, they would have been treated as a dividend. If the securities purchase transactions had been accounted for by ICB as a dividend, the sum of the amount of that dividend (in excess of $700,000) and the amount of the cash dividends declared by ICB from April 1, 1972, through September 9, 1974 ($1,162,784) would have exceeded the sum of the net profits from April 1, 1972, through December 31, 1973 ($1,342,152) and the net profits from January 1, 1974, through August, 1974 reflected on the financial statements of ICB presented to the September, 1974 board meeting ($218,000) by more than $300,000 and a default under section 4 would clearly have occurred when the September dividend was declared.

Since section 4 of the Note Agreement clearly contemplates that the propriety of any dividend is to be determined on the date of declaration of that dividend, the only conclusion to be reached from Mr. Cook's direct testimony is that the declaration of the September dividend resulted in an event of default under section 4. Since the district court concluded, at the conclusion of the trial, that the September dividend had not precipitated a default under section 4, one might well wonder what occurred during Mr. Cook's cross-examination to rehabilitate the FDIC's position. Mr. Cook's testimony on cross-examination is not lengthy (only three pages of the transcript) and is featured prominently in the FDIC's brief on appeal. In relevant part, it is as follows:

Q  Do I understand that what you have just told Mr. Tulley is that Touche Ross did, indeed, in its auditing process pay particular attention to whether or not the dividends that were declared prior to September of 1974, were proper under the terms of the Capital Note Agreement?

A  Yes.

Q  Touche Ross specifically considered those questions?

A  Yes.

Q  Did anything come to your attention back at that time that indicated to you

that the dividend restriction provisions were violated by the bank in the declaration of any given dividend?

A  No.

Q  Did anything come to your attention subsequent to that time that would so indicate to you?

A  Based on the financial statements of the bank?

Q  Correct.

A  No.

Q  Your firm of independent certified public accountants audited the financial statements of ICB and the parent for each of the years in question?

A  Yes.

Q  And you certified those financial statements as having been prepared in accordance with generally accepted accounting principles and fairly reflecting the financial condition of the entity?

A  Yes, sir.

. . . .

Q  Now, as of the September 9, 1974 dividend, is it your opinion that the ICB—the bank, did or did not have sufficient cumulative net profits to pay that dividend under the dividend restrictions in the Senior Capital Note agreement?

MR. TULLEY: Objection, your Honor. I don't think the proper foundation was laid or given for the witness to express an opinion. He testified that his firm only did what the bank told him.

THE COURT: I think you laid the foundation. Go ahead.

THE WITNESS: Would you repeat, sir?

BY MR. EICHIN:

Q  What I want to know is whether or not you think that as of the September 9, 1974 dividend, ICB bank had enough cumulative net income, I think, earned after April 1, 1972, to properly pay the dividend under the terms of the Senior Capital Note Agreement?

A  We felt they had enough cumulative net earnings to do that, yes, sir.

On the surface, this generalized testimony to the effect that the September dividend did not violate section 4 of the Note Agreement appears to contradict the more specific testimony adduced on direct examination. But, upon close examination, it does not. The questions directed to Mr. Cook on cross-examination related to the conclusions of Touche Ross arrived at during the course of its annual audit, which began after the date of declaration of the September dividend. Mr. Cook's conclusions are based on the financial statements of ICB at year end, and as was indicated in Mr. Cook's direct testimony, in the year end financial statements of ICB the securities purchase transactions were restructured as a loan. Mr. Cook's testimony on cross-examination brings to mind a comment made by him during his direct testimony which helps to explain the conclusions reached by Touche Ross in connection with the annual audit. That testimony was to the effect that, in his view, the securities purchase transactions were not, in September, 1974, "a completed transaction." The reason for that conclusion is that, subsequent to September, the securities purchase transactions were restructured as a "loan," and one of the objectives of the restructuring was to avoid the creation of a default under section 4 of the Note Agreement through the declaration of the September dividend. The clear language of section 4, however, indicates that the propriety of any dividend is to be judged on the day on which it is declared. There is no evidence in this record that on or before that day, the securities purchase transactions were considered by ICB to be anything other than a purchase, which would be properly accounted for as a dividend. Testimony about how the transaction was restructured, after the date of declaration of the dividend, in order to alter the accounting treatment of the dividend and to avoid a default under the Note Agreement and about the effect of that restructuring on the year end financial statements is clearly not relevant to the question whether, on the date of the September Board meeting, a default occurred. A careful review of Mr. Cook's direct testi-

mony, which was not contradicted by any relevant testimony on cross-examination, indicates that the declaration of the September dividend created an event of default under section 4 of the Note Agreement, and we hold that the district court was clearly erroneous in reaching the opposite conclusion.[2]

As indicated earlier in connection with the discussion of the evidentiary ruling of the district court relating to the testimony of William Coe, the district court admitted testimony by Mr. Coe on the subject of the accounting treatment of the securities purchase transaction following Mr. Cook's testimony. While the FDIC takes issue with the degree of Mr. Coe's assurance, it is sufficient for our purposes to state that nothing in his testimony in any way undermines our conclusion.

Because the district court reached the conclusion that an event of default had not occurred under the Note Agreement, the court concluded that it was not necessary to decide the other issue litigated during the trial—"whether LNB properly placed ICB in default." The court commented, however, that it was highly unlikely that LNB had properly placed ICB in default. In order to avoid the necessity for a remand on this issue, we have reviewed the evidence presented by LNB at trial and have concluded that LNB did properly place ICB in default under section 4 of the Note Agreement. LNB introduced into evidence at trial the letters dated May 4 and May 7, 1976, advising of the occurrence of an event of default and declaring the principal and any accrued interest on the Notes to be immediately due and payable. Under the terms of the Note Agreement, that notice was all that was required to place ICB in default.

One of the issues litigated at trial was whether LNB in some way waived its rights upon default either by failing immediately to offset the deposits against the $500,000 owed by ICB on the Notes and by allowing numerous withdrawals and deposits to be made to the accounts of ICB after the date of acceleration, or by failing to take affirmative steps to collect the indebtedness of ICB after sending the notice. Under Louisiana law, a person claiming an extension of the due date of indebtedness or a waiver of the obligation to make payment on the indebtedness has the burden of proof. *See Andrus v. Andrus*, 326 So.2d 882 (La.App. 3d Cir. 1976). In order to establish such a waiver or an extension, there must be proof of an agreement between the obligor and the obligee whereby, for sufficient consideration, the obligee agrees to forego his right of action against the obligor during the extension period. Louisiana courts have held that such an agreement may be implied from circumstances attending the transaction between the obligor and the obligee. However, the obligee's mere gratuitous forbearance from exercising its legal rights under the instrument of indebtedness has not been held to create an agreement to extend the period of indebtedness. *See Parker v. Guillot*, 118 La. 223, 42 So. 782 (1907) (delay in payment granted to holder held not to be an extension agreement or waiver). Similarly, an extension of

---

**2.** Because the FDIC· has asserted throughout this litigation that no default occurred by reason of the declaration of the September dividend, it has not specifically urged that the restructuring of the dividend as a loan in late 1974 or early 1975 "cured" the September default. We note that restructuring a prior transaction is a different type of "cure" than might arguably occur if, for example, the net worth of a borrower fell below the minimum net worth specified in a net worth covenant in a loan agreement, but later (and before any debt holder accelerated the debt) increased to a level in excess of the minimum net worth as a result of earnings in a subsequent period. We note also

that during the interval between the declaration of the September dividend and the point in late 1974 or early 1975 when the dividend was restructured into a loan, the financial position of ICB deteriorated substantially and that ICB later failed, leading to a loss to LNB and other debt holders and depositors of ICB. In the absence of further factual development and legal analysis by the parties, we intimate no opinion as to the legal efficacy of utilizing a subsequent transaction to undo an earlier one and thereby to "cure" a default occasioned under a loan agreement by the earlier transaction.

the debt cannot be inferred from a mere forbearance to sue where no extension of time is ever expressly granted by the holder of the indebtedness. *See Mutual National Bank v. Coco*, 107 La. 268, 31 So. 628 (1902). It is clear, then, that absent an express agreement by LNB to forebear (as to which there is no evidence in the record), LNB's failure to file suit on the debt or to undertake other collection efforts is not sufficient to constitute a waiver.

The judgment of the district court is reversed and the case is remanded with instructions to enter judgment for the defendant.

REVERSED and REMANDED.