FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff-Appellant,

v.

BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, Defendant-Appellee.

No. 81–4590.

United States Court of Appeals, Ninth Circuit.

Argued Sept. 15, 1982.

Reargued and Submitted Dec. 16, 1982.

Decided March 18, 1983.

Thomas A. Brooks, Myers N. Fisher, FDIC, Washington, D.C., Aaron M. Peck, McKenna, Conner & Cuneo, Los Angeles, Cal., for plaintiff-appellant.

Harold J. McElhinny, Morrison & Foerster, San Francisco, Cal., for defendant-appellee.

Before DUNIWAY, PREGERSON and BOOCHEVER, Circuit Judges.

DUNIWAY, Circuit Judge:

The Federal Deposit Insurance Corporation (FDIC) appeals from a summary judgment in favor of Bank of America, N.T. & S.A., in an action by FDIC to recover moneys deposited with Bank of America by Banco Credito y Ahorro Ponceno, a Puerto Rican Bank (Banco Credito) which became insolvent. Bank of America offset its liability for the deposits against the unpaid balance owed to it on a $5,000,000 subordinated capital note issued by Banco Credito. The trial court upheld the setoff. We reverse.

### I. The Facts.

Banco Credito was organized under the laws of Puerto Rico and regulated by the Puerto Rican Secretary of the Treasury. The depositors of Banco Credito were insured by FDIC. In 1973 Banco Credito received permission from the Secretary to issue subordinated capital notes, and on December 27, 1973, Banco Credito and Bank of America entered into a note purchase agreement. Puerto Rican law provides, in pertinent part:

Such capital notes shall be subject in right to the obligations with the depositors and other creditors of the issuing bank.... The Secretary of the Treasury may suspend the payment of the principal of and interest on capital notes on or before they fall due, when such payment may reduce the aggregate total amount of the capital stock, reserve fund and capital notes, and when in his judgment such payment may affect the economic solvency of the bank and endanger the interests of the depositors and of the public in general.

(P.R. Laws Ann., Tit 7, § 111(o))

The note purchase agreement included these provisions and provided for a $5,000,-000 capital note to be issued to Bank of America. The agreement also included the following provision: "Nothing in this agreement shall be deemed any waiver or prohibition of BANKS' [Bank of America's] right of banker's lien or setoff." (§ 7.6) Pursuant to Regulation No. 4 of the Puerto Rican Secretary of the Treasury, the agreement was submitted to the Secretary for his approval. He approved the agreement without questioning the inclusion of the setoff provision, and on December 28, 1973, Banco Credito executed a $5,000,000 subordinated capital note in favor of Bank of America which stated its subordinated character and the Secretary's right to suspend payments. Although the note did not include a setoff provision, it incorporated the terms of the note purchase agreement by reference. The note was to be repaid over a seven-year period ending on December 28, 1980.

Banco Credito made timely payments of principal and interest through June 24, 1977. On that day, the Secretary, acting under authority of P.R. Laws Ann., Tit. 7, § 111(o) and his Regulation No. 4, determined that continued payment of the note would affect the solvency of Banco Credito and suspended Banco Credito's obligation to make payments of principal and interest on the note. The Secretary's order was never revoked and no further payments were made on the note. At the time of the suspension Banco Credito owed Bank of America a balance of approximately $3,250,000 on the note.

On March 31, 1978, the Secretary determined that Banco Credito was not in sufficiently sound financial condition to continue its operations and was insolvent. Acting pursuant to P.R. Laws Ann., Tit. 7, § 201, the Secretary assumed control of Banco Credito and appointed FDIC as receiver of Banco Credito for the purpose of its total liquidation.

Among the assets of Banco Credito on March 31, 1978 was approximately $1,000,-000 on deposit at Bank of America branches in San Francisco, California, and St. Croix and St. Thomas, Virgin Islands. These deposit accounts apparently pre-existed the note purchase agreement. Upon discovering that Banco Credito was insolvent and in receivership, Bank of America promptly set off $903,589.15 of the demand deposit accounts as a credit against Banco Credito's outstanding debt on the subordinated capital note. Approximately three years later Bank of America set off an additional $78,-609.46 from the same Banco Credito accounts. The setoffs left Banco Credito indebted to Bank of America on the capital note in an amount of approximately $2,250,-000, none of which has been paid.

After its appointment as receiver, FDIC embarked upon the liquidation of Banco Credito by a "purchase and assumption" agreement with another Puerto Rican bank under which the assuming bank assumes the insolvent bank's liabilities as consideration for transfer of the insolvent bank's marketable assets. The assuming bank was entitled to return to FDIC as receiver any uncollectible receivables of the insolvent bank. When Bank of America claimed setoff and refused to honor the assuming bank's demand for the amounts on deposit, the uncollectible obligation was reassigned to the FDIC as receiver, and it, in turn, sold the deposit obligation to the FDIC in its corporate capacity.

FDIC, in its corporate capacity, brought this action against Bank of America in the United States district court in San Francis-

co alleging breach of contract and conversion by Bank of America in refusing to honor the deposit obligation. Bank of America defended the claims on the ground that it had properly set off the deposit balances against the obligation of Banco Credito to it on the subordinated note.

The parties made cross-motions for summary judgment at the invitation of the court. The court granted summary judgment for Bank of America on the ground that the right of setoff was explicitly preserved in the note purchase agreement which had been approved by the Puerto Rican Secretary of the Treasury.

FDIC moved for a new trial on the ground that it had discovered new evidence. The court denied the motion. FDIC now appeals from both the summary judgment and the denial of its motion for a new trial.

## II. *The Applicable Law.*

 Where, as here, the FDIC is proceeding in its corporate capacity, federal law applies. *D'Oench, Duhme & Co. v. F.D. I.C.,* 1942, 315 U.S. 447, 455–456, 467–468, 62 S.Ct. 676, 678–79, 683–84, 86 L.Ed. 956 (Jackson, J., concurring). The Federal Deposit Insurance Act, 12 U.S.C. ch. 16, provides, in § 1819 Fourth, that "All suits of a civil nature at common law or in equity to which the [Federal Deposit Insurance] Corporation shall be a party shall be deemed to arise under the law of the United States, . . ." There is an exception, not applicable here, for cases in which FDIC is acting "in its capacity as receiver of a State bank." *D'Oench, supra,* applies a similar provision in former 12 U.S.C. § 264(j) Fourth.

The parties have not called to our attention any Federal decisions, or for that matter, any California or Puerto Rico decision, or any decision of any other jurisdiction, dealing with the precise issue before us: whether a bank that holds a subordinated capital note of a Puerto Rican bank and has on deposit funds of the Puerto Rican bank should be permitted to set off the deposited funds against the indebtedness of the Puerto Rican bank on the subordinated note. Nor have the parties brought to our attention any federal statute dealing with that

question. Under these circumstances, we "are free to apply the traditional common-law technique of decision and draw upon all the sources of the common law in cases such as the present." *Federal Deposit Ins. Corp. v. Meo,* 9 Cir., 1974, 505 F.2d 790, 793, n. 4, quoting from *D'Oench, supra,* 315 U.S. at 472, 62 S.Ct. at 686 (Jackson, J., concurring).

What, then, should we look to as the federal law? The note purchase agreement says, in § 7.7, "the law of California." Courts generally have held, and this court specifically has held, that parties may agree as to the law to be applied to their contract. *See* Restatement, Conflict of Laws 2d., § 187; *North River Ins. Co. v. Fed Sea/Fed Pac Line,* 9 Cir., 1981, 647 F.2d 985, 987. The transaction has certain California features. Payment was to be made in California, Bank of America's head office is in California, and the setoff was accomplished in part in California and in part in the Virgin Islands. This action was brought by FDIC in a federal court in California.

On the other hand, Banco Credito was a Puerto Rican bank, organized and regulated by Puerto Rican law, and doing business in Puerto Rico. The note purchase agreement was made subordinate pursuant to Puerto Rican law, and the subordination provision is for the protection of the depositors and other creditors of Banco Credito. The power of the Secretary in Puerto Rico to suspend payments on the note exists under Puerto Rican law and is to be exercised for the benefit of those creditors. The objective was to put those creditors ahead of the holders of the subordinated notes, such as Bank of America. A broader objective of the law was to help to maintain the solvency of Puerto Rican banks, and the public confidence in them, conditions important to the viability and prosperity of the Puerto Rican economy. All of these considerations point to the law of Puerto Rico, and the provisions of that law and of Puerto Rican Regulation 4 are incorporated, almost verbatim, in the capital note and the note purchase agreement. Those provisions bear directly on the question that we must decide.

Section 187(2) of the Restatement provides that the law of the state chosen by the parties to a contract will be applied unless:

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Comment g to. § 187 states, in part: The chosen law should not be applied without regard for the interests of the state which would be the state of the applicable law with respect to the particular issue involved in the absence of an effective choice of the parties. . . . Application of the chosen law will be refused only (1) to protect a fundamental policy of the state which, under the rule of § 188, would be the state of the otherwise applicable law, provided (2) that this state has a materially greater interest than the state of the chosen law in the determination of the particular issue.

\* \* \* \* \* \*

No detailed statement can be made of the situations where a "fundamental" policy of the state of the otherwise applicable law will be found to exist.

\* \* \* \* \* \*

To be "fundamental," a policy must in any event be a substantial one.

█ We hold that the provisions of Puerto Rican law and regulations governing the issuance and subordination of the capital notes of Puerto Rican banks are "fundamental," and we therefore look to that law for the resolution of the issue that is before us.

### III. *The Claimed Right of Setoff.*
#### A.

█ We first consider whether, if the note purchase agreement did not contain the provision against waiver or prohibition of Bank of America's "right of banker's lien or setoff," Bank of America could have set off the deposits against the subordinated note. We conclude that it could not.

The law of Puerto Rico which we have quoted expressly provides for the subordination of the capital note, and makes it clear that this is for the protection of the depositors and creditors of Banco Credito. Regulation No. 4 of the Secretary of the Treasury of Puerto Rico makes this purpose even more explicit. It requires that the Secretary "take into consideration the capital needs of the bank, its financial condition and if the said issuance of capital notes will accrue to the benefit of the depositors, creditors, stockholders, and to [sic] the general public." (Reg. 4. A. 1–); "The capital notes shall be subordinate in all rights to the bank's liabilities to its depositors, liabilities under bankers acceptances and letters of credit, and any other current obligation characteristic of banking operations." (Reg. 4. A. 3–); and "Capital notes will be considered as part of the capital with respect to Sections 8 and 9 of the Banking Law." (Reg. 4. A. 10–).

Thus the capital note has some of the qualities of stock of Banco Credito, and some of the qualities of a debt owed by Banco Credito. Like stock, it represents moneys paid into the bank as capital. Like a stockholder, the holder of the note is subordinated to the rights of the general creditors of the bank. The moneys received from both the stock and the capital note are there as the bank's capital, and are there for the protection of the depositors, creditors and the general public (Reg. 4. A. 1–, *supra*) and, in the case of moneys derived from the note, for the benefit of the stockholders. (*Id.*) Surely, if Bank of America had bought stock of Banco Credito, common or preferred, it could not offset its obligation to Banco Credito for the latter's deposits against its investment in the stock.

The subordinated note is not stock, however. It obligated Banco Credito to repay the $5,000,000 over time with interest, and Banco Credito had repaid approximately a million and three quarters dollars, plus in-

terest, when Bank of America attempted to offset the deposits against the notes. There then remained approximately $3,250,-000 unpaid, and when the Secretary suspended Banco Credito's obligation to pay, his purpose was to prevent, for the benefit of creditors, any further diminution of the assets of Banco Credito, thereby protecting its depositors and creditors. Thus, at that point, Bank of America was relegated to a position behind the depositors and general creditors of Banco Credito—an eventuality obviously contemplated as possible when Bank of America bought the subordinated note. Whether Bank of America would come ahead of Banco Credito's stockholders if any money was left after the creditors were paid we need not consider; we assume that it would.

The effect of the offset was to defeat the purpose of the subordination of the capital note, to the tune of approximately one million dollars. Not only that, but the effect was also to put Bank of America ahead of all of the depositors and creditors of Banco Credito, by that amount, rather than its being subordinate to their rights. Bank of America kept the million; the depositors and creditors got none of it.

Bank of America argues that setoff is not payment of the subordinated note, and that therefore P.R. Laws, Tit. 7, § 111(*o*) and Regulation No. 4 do not apply. It is true that, technically, "setoff" is not "payment," *New York County National Bank v. Massey,* 1904, 192 U.S. 138, 147–148, 24 S.Ct. 199, 201–02, 48 L.Ed. 380. But that does not answer the question before us. The effect of the setoff was to reduce the amount of the note by $1 million and to deprive Banco Credito of the $1 million that it, or its receiver, could have used to pay its depositors and other creditors.

■ It is true that, in bankruptcy, a bank has a right to set off a debt that it owes to its bankrupt customer, in the form of a demand deposit, against the customer's debt to the bank, even when the customer, as in this case, is another bank that is insolvent (*New York County Bank, supra,* at 148, 24 S.Ct. at 202), and even though, to the ex-

tent of the setoff, the setoff can be said to prefer the offsetting bank to the creditors of the debtor. *See Scott v. Armstrong,* 1892, 146 U.S. 499, 511, 13 S.Ct. 148, 151, 36 L.Ed. 1059; *Studley v. Boylston National Bank,* 1913, 229 U.S. 523, 528, 33 S.Ct. 806, 808, 57 L.Ed. 1313; *Cumberland Glass Mfg. Co. v. DeWitt & Co.,* 1915, 237 U.S. 447, 455, 35 S.Ct. 636, 639, 59 L.Ed. 1042. In the cases cited, the Court reviewed the history of setoff, concluding that it had long been permitted in courts of equity, and that the express provision for setoff in the bankruptcy statutes simply recognized the right. However, none of the foregoing cases dealt with setoff against a subordinated obligation, such as we have in this case. Here, we are not concerned with the general rule permitting setoff, but with whether it is applicable to this case.

We assume, for the purpose of this case, that there was a sufficient default on the subordinated note by Banco Credito, when the Secretary made his order of June 24, 1977, to trigger the right of setoff, if it existed.

Neither party has cited a case deciding whether there can be a setoff against a subordinated capital note like the one here involved, when the issuing bank becomes insolvent. One case, cited by Bank of America, did involve such a note. *Federal Deposit Ins. Corp. v. Louisiana Nat. Bank,* 5 Cir., 1981, 653 F.2d 927, 930. But there, the question of whether, in the light of the subordination, there could be a setoff, was conceded, if there was a default.

■ In deciding whether there would be a right of setoff here, absent the setoff clause in the note agreement, we keep in mind that, as Bank of America argues, setoff is a creature of the courts of equity. As Justice Tobriner, speaking for a unanimous California Supreme Court, remarked, "The creditor's right to setoff is not absolute, but may be restricted by judicial limitations imposed to uphold a state policy of protecting the rights of the debtor." *Kruger v. Wells Fargo Bank,* 1974, 11 Cal.3d 352, 367, 113 Cal.Rptr. 449, 521 P.2d 441. Setoff will not be permitted when it would be inequita-

ble or contrary to public policy to do so. We think that here public policy would forbid setoff.

▮ In spite of the "California law" provision of the note purchase agreement, we hold that the provisions of Puerto Rico's statute § 111(o) and of its Regulation 4 are the controlling law governing the relationship between Bank of America and Banco Credito, insofar as the setoff is concerned, and that, if confronted by the question, the California courts would also so hold, as a matter of California law. The purpose for which Banco Credito sought the loan from Bank of America was to strengthen its capital position, and Bank of America knew it. The provisions of the Puerto Rican law and regulation, subordinating Bank of America's rights, as lender, to the rights of the depositors and other creditors of Banco Credito, were incorporated in the note and agreement. To permit Bank of America to offset Banco Credito's deposits against its liability on the subordinated note deprives the intended beneficiaries of the subordinated loan, Banco Credito's depositors and creditors, pro tanto, of the very protection that the law, and the subordination provisions of the agreement, were designed to create.

Most closely analogous are cases dealing with assessments upon capital stock or contracts to purchase stock—especially bank stock. In *Sawyer v. Hoag*, 1873, 84 U.S. (17 Wall) 610, 21 L.Ed. 731 Sawyer gave a $5,000 check to an insurance company as payment of the full price of shares of its stock. The company, simultaneously, gave him a check for the same amount, less 15%, i.e. $4,250, and took his note for the $4,250. The company treated Sawyer's stock as fully paid for, and carried the note as an ordinary asset. When the financial condition of the company became shaky, Sawyer bought a loss claim against it, at a discount, and when a petition in bankruptcy was filed against the company, Sawyer sought to set off the claim against his note. The Court held that he could not do so, in spite of the setoff provision of the Bankruptcy Act. This was because Sawyer's note to the com-

pany was a disguised payment for the stock, and, when the company went bankrupt, it became a part of a trust fund—its capital—for the creditors. The Court described the transaction as follows:

> We do not believe we characterize it too strongly when we say that it was a fraud upon the public who were expected to deal with them [the insurance company]. (84 U.S. (17 Wall) at p. 622)

With reference to the Bankruptcy Act, the Court said:

> This section was not intended to enlarge the doctrine of set-off, or to enable a party to make a set-off in cases where the principles of legal or equitable set-off did not previously authorize it.
>
> The debts must be mutual; must be in the same right.
>
> The case before us is not of that character. The debt which the appellant owed for his stock was a trust fund devoted to the payment of all the creditors of the company. As soon as the company became insolvent, and this fact became known to the appellant, the right of set-off for an ordinary debt to its full amount ceased. It became a fund belonging equally in equity to all the creditors, and could not be appropriated by the debtor to the exclusive payment of his own claim. (*Id.*)

The relevancy of the foregoing to the case before us is clear.

Other decisions have reached comparable results. In *Wingate v. Orchard*, 9 Cir., 1896, 75 Fed. 241, this court dealt with an attempt, by a stockholder in a national bank, whose stock had been assessed by the comptroller of the currency, to set off against the assessment the amount of his deposit in the bank. This court held that he could not do so, saying:

> Obviously, to permit a holder of stock in such a bank to offset against an assessment for the additional liability thus imposed upon him as such a holder the amount of his deposits in the bank, in respect to which he is no more entitled than any other creditor, would be, in effect, to make him a preferred credi-

tor.... Such was not the intention of congress in imposing, as it did, by section 5151 of the Revised Statutes, upon the shareholders of every national banking association, in addition to the amount invested in such shares, a liability for all contracts, debts, and engagements of such association, to the extent of the amount of their stock therein, at the par value thereof. On the contrary, the purpose was, as has been said, to provide a fund to which all creditors should be entitled to look upon equal terms, and in which, in the event of disaster, all creditors, without preference to any, should be entitled to share pro rata. (pp. 242–243)

The analogy between the assessment and the unpaid balance of the subordinated note in the case before us is, we think, compelling.

See also *Roth v. Baldwin,* D.C.Cir., 1934, 74 F.2d 1003, 1004, citing and following *Wingate; Federal Deposit Ins. Corp. v. de Jesus Velez,* 1 Cir., 1982, 678 F.2d 371, 376, involving subordinated debentures of a Puerto Rican bank; *Walker v. J.B. McCrary Co.,* Ala., 1916, 197 Ala. 638, 73 So. 342, denying setoff to the holder of a subordinated note.

Also relevant and persuasive are cases dealing with a corporation's purchase of its own stock, the seller having received the corporation's note for all or a part of the purchase price. If the corporation becomes insolvent, it has been held that the note holder's claim against the corporation must be subordinated to the claims of the other creditors of the corporation. We so held in *McConnell v. Estate of W.H. Butler,* 9 Cir., 1968, 402 F.2d 362, 366–367, citing and following *Robinson v. Wangemann,* 5 Cir., 1935, 75 F.2d 756, 757–758. In *Matter of Hawaii Corp.,* 9 Cir., 1982, 694 F.2d 179, we cited and followed *McConnell* in a similar case.

The rationale of these cases is stated in *Matter of Hawaii Corp.* as follows:

The *McConnell* rule is based on the recognition that the capital stock of a corporation is actually a trust fund for its creditors. A corporation that acquires by purchase its own stock in fact distributes a portion of its assets to the selling stockholder. *Robinson v. Wangemann,* 75 F.2d at 757. Because of this fact, when debt securities are issued in exchange for a company's own stock, " '[i]t is necessary to a recovery that the corporation should be solvent and have sufficient surplus to prevent injury to creditors *when the payment is actually made.*' " *McConnell,* 402 F.2d at 366 (quoting *Robinson v. Wangemann,* 75 F.2d at 757–58) (emphasis in original). Until the APG–NATEC notes were paid, appellants' claim on the assets of the issuing corporation was deemed to be that of a shareholder, subordinate to general unsecured creditors. (694 F.2d at 181)

We find this rationale persuasive here, because here the capital note was issued to increase the capital of Banco Credito, primarily for the benefit and protection of its depositors and general creditors. As with a note given to buy the Bank's stock, the subordination becomes important, and therefore must be enforced, when the bank becomes insolvent or "does not have sufficient surplus to prevent injury to creditors when the payment [on the subordinated note] is actually made."

Bank of America relies on cases upholding a setoff of bankrupt's or insolvent's claim against a creditor against the creditor's claim against the bankrupt or insolvent. These cases hold that such setoffs do not create an unlawful preference, even though it is true that the net effect is to put the offsetting creditor in a better position than creditors who owe no debt to use as an offset. *See, e.g., New York County National Bank, supra; Scott v. Armstrong, supra.* But those cases do not involve subordinated claims such as we have here.

Bank of America argues that the fact that a debt is subordinated to the right of other creditors does not preclude the exercise of setoff against it of an obligation owed to an insolvent entity. It cites bankruptcy cases permitting setoff against subordinated debts.

*Hayden v. Standard Accident Insurance Co.*, 9 Cir., 1963, 316 F.2d 598, was governed by the Bankruptcy Act, in which both setoff and the surety's subordination rights were explicitly addressed. The Bankruptcy Act displayed no public policy against the set-offs, as is exhibited in the Puerto Rican statute.

In *Rochelle v. United States*, 5 Cir., 1975, 521 F.2d 844, 845, *modified on other grounds*, 1976, 526 F.2d 405, the court allowed the government to set off tax refunds owing to a bankrupt partner against a bankrupt partnership's tax liabilities, even though partnership creditors were, by statute, subordinated as creditors of individual partners to non-partnership creditors of those partners. This subordination resulted from § 5g, former 11 U.S.C. § 23g, of the old Bankruptcy Act. We cannot find in that subordination the elements of important ("fundamental") public policy that are present in the case at bar.

In the case at bar there is an important public policy that would be frustrated if the setoff were allowed. The capital note was subordinated by statute for the protection of the depositors and other creditors of Banco Credito—an objective that also protects the FDIC. *See F.D.I.C. v. de Jesus Velez, supra*, 678 F.2d at 375, and *Matter of Weis Securities, Inc.*, 2 Cir., 1978, 605 F.2d 590, 595–596. The subordination also serves the important function of maintaining public confidence in and the stability of the banking system.

As the trial judge said:

I don't think there's any doubt of the fact that a substantial public interest was involved in the subordination. If there were no provision to the contrary, I would deny offset as being totally inconsistent with the provisions of the subordination.

The whole concept of the subordination was that that money was to be there for the benefit of creditors and depositers [sic] as part of the capital of the Puerto Rican bank and was to be recaptured only under limited circumstances. But all of that is negated to the extent of setoff by the contractual provision.

(Tr. of oral argument, CR No. 77, pp. 18–19)

We conclude that, if the note purchase agreement had said nothing about setoff, Bank of America could not have set off Banco Credito's deposits against the subordinated note.

### B.

We now turn to the effect of the provision in the note purchase agreement reading: "7.6 Nothing in this Agreement shall be deemed any waiver or prohibition of BANKS' right of banker's lien or setoff." (CR 51, Exhibit B, § 7.6, p. 19).

The trial judge, at the concluding arguments, said:

I can't see that 7.6 can be talking about any parts of the contract except those that might presumably be thought to limit or waive or prohibit setoff and I don't see anything else in the contract other than the subordination provisions that would seem to be doing that. And it says nothing in this contract waives or prohibits. It must be talking about that. What else would it be talking about? [CR 77 at 33:15–22]

He then held that the agreement did permit the setoff, and gave judgment for Bank of America.

■ We assume, without deciding, that the judge's construction of the agreement is correct. But we hold that, as applied in this case, § 7.6 of the agreement is invalid because it contravenes the public policy behind the terms of the agreement that subordinate Bank of America's rights to those of the depositors and general creditors of Banco Credito.

The language of the Puerto Rican statute and Regulation No. 4 promulgated under it support this conclusion. The Puerto Rican statute provides that the "capital notes shall be subject *in right* to the obligations with the depositors and other creditors of the issuing bank." P.R.Laws Ann., tit. 7, § 111(*o*) (emphasis added). The regulation clarifies this restriction, providing: "The

capital notes shall be subordinate *in all rights* to the bank's liabilities to its depositors, liabilities under bankers acceptances and letters of credit, and any other current obligations characteristic of banking operations." P.R.R. & Regs., tit. 4, no. 4 (emphasis added). Although neither the statute nor the regulation directly addresses the issue of setoff, the phrases "subject in right" and "subordinate in all rights" indicate an intent, in the event of the insolvency of the bank that issued the capital note, to subordinate the right of offset that the holder of the capital note would otherwise have, to the superior right of the issuing bank's depositors and creditors. Puerto Rico allows banks organized under its laws to issue capital notes only under strict conditions with the aim of protecting "the interests of depositors" and "the economic solvency of the bank." P.R.Laws Ann., tit. 7, § 111(*o*). Private parties may not contract so as to frustrate that aim.

Moreover, the right of setoff could be abused. A large bank holding capital notes could put pressure—perhaps irresistible pressure—upon Banco Credito to increase its deposits with that bank if it thought that Banco Credito's condition was getting shaky. If the right of setoff existed, this would have further reduced the moneys available to Banco Credito's creditors. There is no evidence that there was such conduct here. But the possibility is a further reason for holding that public policy prevents the setoff, in spite of § 7.6 of the agreement.

If the only persons affected by the setoff were Bank of America and Banco Credito, the result might be different. The depositors and other creditors of Banco Credito, however, were not parties to the note purchase agreement, and had no say in negotiating its terms. The Secretary of the Treasury of Puerto Rico, who approved the agreement, was supposed to be acting for their protection. Considering that duty, we do not think that he had authority to approve § 7.6, insofar as it can be said to purport to permit a setoff after the Secretary ordered the obligation of Banco Credito on the capital note suspended. To that

extent, his approval of § 7.6 is a nullity and § 7.6 is void.

### IV. *Conclusion.*

The question we have decided is one of law, not one of fact. We reverse the judgment and remand the case to the trial court with directions to enter judgment for the FDIC.