FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff,

v.

W. Jerome ASHLEY et al., Defendants.

Civ. A. No. 75–71600.

United States District Court, E. D. Michigan, S. D.

March 8, 1976.

Kenneth E. Scherer, Daner, Freeman, McKenzie & Matthews, Larry E. Powe, Mt. Clemens, Mich., for plaintiff.

Walter J. Murray, Detroit, Mich., for defendant Ashley.

Robert G. Russell, Detroit, Mich., for defendants Buhai & Jones.

James M. Wienner, Detroit, Mich., for defendant Cooley.

Leonard A. Wilcox, Detroit, Mich., for defendant Kristufak.

Richard D. Rohr and George G. Kemsley, Detroit, Mich., for defendants Robert and William Verhelle.

## OPINION AND ORDER DISMISSING ACTION FOR LACK OF JURISDICTION

KENNEDY, District Judge.

The Court on its own motion issued an order to show cause why this action should not be dismissed for lack of jurisdiction. The parties responded and have briefed and orally argued the issue. Plaintiff asserts that the Court has jurisdiction of this action by the Federal Deposit Insurance Corporation (FDIC) against former officers and directors of the Tri-City Bank of Warren.

The relevant jurisdictional provision is 12 U.S.C. § 1819, which provides:

[The FDIC] shall have power—

. . . . .

Fourth. To sue and be sued . . . All suits of a civil nature at common law or in equity to which the Corporation shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy; and the Corporation may, . . . remove any such action . . . from a State court to the United States district court for the district or division embracing the place where the same is pending . . . , except that any such suit to which the Corporation is a party in its capacity as receiver of a State bank and which involves only the rights or obligations of depositors, creditors, stockholders and such State bank under State law shall not be deemed to arise under the laws of the United States. . . .

[Emphasis added.]

Plaintiff does not contend that the claims it makes in this case are other than those involving only the rights or obligations of depositors, creditors, stockholders and the State bank under state law.

The facts are essentially as follows: On September 27, 1974, the Macomb County Circuit Court appointed the FDIC receiver of the Tri-City Bank of Warren (hereinafter referred to as Tri-City), pursuant to MSA § 23.710(151); the following day a series of agreements were entered into; the Michigan National Bank of Macomb assumed all of the deposit liabilities of Tri-City, in return for which it received from the FDIC as receiver of Tri-City that bank's cash and government securities plus certain "acceptable assets."

The acceptable assets were to consist of "cash deposits in other banks, and such other assets of sound banking quality which are being assigned and conveyed to Assuming Bank at agreed values under the terms of a contract between the Selling Bank and Assuming Bank." While this definition would appear to include assets such as loans, the only "acceptable assets" transferred to the Assuming Bank were cash, amounts due from other banks, United States Government Securities, and furniture, fixtures, equipment and leasehold improvements of the Tri-City Bank. All of Tri-City Bank's loan assets were included in the category of "unacceptable assets" and transferred to the FDIC.

The agreement between the Banks and the FDIC was that the acceptable assets were transferred on the understanding that these assets were to equal $1.158 Million less than the deposit liabilities assumed by the Macomb bank.[1]

1. Paragraph 7 of the Agreement (Selling Bank —FDIC) provides:

The agreed value of the acceptable assets as shown in Exhibit "A" hereto, together with the cash purchase price being paid for the Property Sold constituting the consideration initially received by Selling Bank hereunder, is intended to equal, but not exceed, the

The various "unacceptable assets" were assigned to the FDIC in return for which the FDIC paid to the assuming bank the amount necessary to bring the total assets transferred to the assuming bank to exactly $1.158 million less than deposit liabilities assumed. The parties agreed that if any of the calculations either of the deposit liabilities or of the value of the acceptable assets turned out to have been inaccurate, a cash adjustment would be made to maintain this $1.158 million differential.[2] The amount that the FDIC was to pay was originally calculated to be $10,-631,248.02. This total has been adjusted pursuant to the agreements to $10,456,-172.47. Affidavit of Larry E. Powe in Support of Plaintiff's Response to Order to Show Cause.

As noted above, the "unacceptable assets" were transferred to the FDIC. Among the assets so transferred were:

> Rights, claims or causes of action against the Bank's directors, officers or employees or their sureties arising out of any act of any such persons in respect to the bank or its property or arising out of the nonperformance or manner of performance of their duties.

aggregate amount of the deposit liabilities of Selling Bank as shown in said Exhibit "A" at the close of business on September 27, 1974, less the sum of $1,158,000.00. Selling Bank warrants Exhibit "A" to be true and correct, but if through omissions, errors in bookkeeping, listing, computation, or otherwise, the amount due by Selling Bank to its depositors shall be less than the amount as shown in Exhibit "A," Selling Bank authorizes and directs Assuming Bank to pay over to the Corporation the amount of such difference forthwith upon discovery thereof (the amount so paid over to the Corporation to constitute a part of the Property Sold).
The $1,158,000.00 is in effect the "premium" or purchase price paid by the Michigan National Bank of Macomb to acquire the business of the Tri-City Bank. Affidavit of Larry E. Powe in Support of Plaintiff's Response to Order to Show Cause.

2. Section XI of the Agreement (Between Banks) states:
In the event that any omissions or errors in computation shall have occurred in completing this Agreement, the parties severally agree to adjust therefor in cash upon the discovery

Assignment, ¶ 5(b) (Exhibit II to Plaintiff's Response to Order to Show Cause).

This action alleges such a claim against officers and directors of Tri-City Bank.

The language of the complaint is somewhat ambiguous regarding the status of the FDIC in bring the action. The complaint begins: "Now Comes FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff Liquidator of TRI–CITY BANK, Warren, Michigan . . . ." However, paragraph 4 recites the appointment of the FDIC as receiver by the Circuit Court and then states that "In order to facilitate the assumption of the Bank's deposit liabilities by another Bank and the liquidation of the Bank's remaining assets, certain assets including the claims asserted to herein, were transferred to the Plaintiff by the Receiver for valuable consideration . . . ."

The language of the "Agreement (Selling Bank—FDIC)" is similarly ambiguous regarding the FDIC's status. The agreement provides that the "unacceptable assets" become the property of the

thereof, it being the intention of the parties that the assets transferred on the basis of the agreed valuations as of the date hereof made shall equal *$1,158,000.00* less than the exact amount of the liabilities to depositors of Selling Bank appearing on its books as of the date hereof and assumed by Assuming Bank pursuant hereto. In implementation of the foregoing, in the event the amount actually due to the depositors named in the Schedule of Liabilities is less than the amount stated in said schedule, Assuming Bank agrees to pay the amount of such excess to the Corporation forthwith upon discovery thereof. If it is discovered subsequent to the date hereof that all or any portion of any deposit transferred to Assuming Bank by Selling Bank constitutes funds the depositor obtained from Selling Bank as the result of an unauthorized or unlawful loan as determined by the Corporation, which loan shall have been transferred to said Corporation by Selling Bank, Assuming Bank shall pay to said Corporation upon its demand, all or any portion of such funds then on deposit, and Assuming Bank shall be discharged from further liability to such depositor under this agreement.

FDIC.[3] However, other provisions suggest that the FDIC's role remains that of a receiver. For example, in the event that in its efforts to collect the unacceptable assets the FDIC recovers more than it paid for those assets (plus certain items of expenses), it will not retain the excess. Rather, the Agreement (Selling Bank—FDIC) obligates it to return the excess to the Selling Bank (that is, to the FDIC as receiver of the Tri-City Bank), presumably for the benefit of unsecured general creditors, and, ultimately, stockholders.[4] Thus, the assign-

3. Selling Bank hereby covenants and warrants that, upon this Agreement becoming effective, it will cease to have any rights, title or interest of any nature, legal or equitable, in or to any of the Property Sold, and that thereupon the Corporation shall have the absolute ownership, and all rights incident thereto, of all of the Property Sold, free and clear of all liens, encumbrances or claims, of any nature, legal or equitable . . . .

Agreement (Selling Bank—FDIC) section 8.

4. Paragraph 10 of the Agreement (Selling Bank—FDIC): states:

10. The Corporation agrees to and does hereby purchase from Selling Bank the Property Sold for the sum of $10,456,172.49, and agrees to pay as an additional cash purchase price such amount, if any, as may be payable in accordance with the provisions hereinafter set forth. The initial cash purchase price and the additional purchase price, if any, provided for herein, constitute the full consideration to be paid by the Corporation to Selling Bank. There shall be no liability or obligation of the Corporation to pay any additional purchase price unless and until the excess recoveries hereinafter referred to in this section shall have been actually received by the Corporation. The additional purchase price to be paid by the Corporation shall be the amount, if any, of the net recoveries to be received by the Corporation from the collection, enforcement, liquidation, resale or operation of the Property Sold in excess of:

(1) The amount of the initial cash purchase price; and

(2) All costs of liquidation paid or incurred by the Corporation in connection with the Property Sold; and

(3) A reasonable return to the Corporation on the aggregate amount which the Corporation from time to time has invested in the Property Sold, including, without being limited to: (a) the amount of initial cash purchase price, and (b) all costs of liquidation paid or incurred by the Corporation in connection with the Property Sold. Such reasonable return shall be equivalent to __ per annum of the total unrecovered, unrealized or uncollected amounts invested, from time to time as aforesaid, by the Corporation, in the Property Sold, after allowing for recoveries effected from time to time by the Corporation, such recoveries to be applied as of the last day of each month against the amount of such investment on which the reasonable return is to be computed. Such reasonable return is to be payable out of any funds recovered by the Corporation from the liquidation of the Property Sold in excess of the said amounts invested by the Corporation in the Property Sold.

The term "costs of liquidation" of assets purchased as herein employed shall include all sums expended or liabilities assumed or incurred by the corporation and in any way arising out of or connected with the following:

(a) The supervision, administration, ownership, operation, improvement, reconstruction, repairing, replacement, protection, preservation, enforcement, collection, liquidation, or sale of the Property Sold:

(b) Obligations or liabilities adjudicated against or imposed upon the Corporation, or voluntarily assumed by the Corporation by way of compromise or otherwise, arising out of or connected with the purchase by the Corporation of any of the Property Sold or this agreement or any phase of the transaction set forth in this agreement, including, without being limited to, the expense of investigating, defending or prosecuting any claims or litigation;

(c) Provided that the following are paid or incurred by the Corporation in connection with activities on its part enumerated under subparagraph (a) of this numerical section, the foregoing specifically enumerated items of expenditure or liability shall in each instance be deemed to include, without being limited to, salaries of employees of the Corporation, any fees, commissions, charges or expenses paid or incurred by the Corporation; amounts paid or incurred for travel, subsistence, telephone, telegraphic or other communication facilities, amounts paid or incurred for the purchase, rental, operation and maintenance of automobiles, machinery, equipment, furniture and fixtures; rentals paid or incurred for office space; amounts paid or incurred for real estate taxes, assessments, liens, encumbrances, or charges; the cost of bookkeeping, accounts, appraisals, examinations, auditors or reports, and the cost of surety bonds, insurance and indemnifications of every kind or character.

Any net income which may be received by the corporation from the operation of the property sold shall be considered as recoveries. If the Corporation shall elect at any time to foreclose

ment from the FDIC (as Receiver) to the FDIC appears to have been made to facilitate the collection of debts and liquidation of assets, traditionally a part of a receiver's role.

The legislative scheme governing the FDIC's role in the liquidation of banks contemplates such assignments. Section 1823(e) of Title 12, United States Code, states, in part:

> Whenever in the judgment of the [FDIC] Board of Directors such action will reduce the risk or avert a threatened loss to the Corporation and will facilitate the sale of the assets of an open or closed insured bank to and assumption of its liabilities by another insured bank, the Corporation may . . . make loans secured in whole or in part by assets of an open or closed insured bank . . . or the Corporation may purchase any such assets . . . . . Any insured national bank or District bank, or the Corporation as receiver thereof, is authorized to contract for such sales or loans . . . . .

The Agreement (Selling Bank—FDIC) recites a number of circumstances that suggest that this arrangement is pursuant to Section 1823(e).[5] See "Whereas" paragraphs.

a borrower's right, title to or interest in any collateral held as security to any of the Property Sold and to purchase said collateral at said sale, any gain realized from the resale by the Corporation of the property so purchased shall be considered recoveries from the Property Sold, and any loss suffered from the resale of any said property so purchased shall be deductible from recoveries from the Property Sold in determining the amount, if any, of the additional purchase price provided for in this section.

5. Of course, the assignment in this case is not entirely authorized by section 1823(e), since the Tri-City bank was chartered by the State of Michigan, and section 1823(e) gives the FDIC the power to assign only when acting as receiver of a national or District of Columbia bank. However, several other provisions provide the appropriate authority.

Section 1821(e) of Title 12 permits the FDIC to act as receiver of insured state banks that have been closed by the appropriate state authorities,

FDIC regulations indicate that upon the taking of an assignment of such assets the FDIC proceeds in the same fashion as it does when it is a receiver of a national bank:

> Assets acquired by the Corporation pursuant to contracts of loan or purchase or deposits with insured banks or receivers of closed insured banks, in accordance with the provisions of the Federal Deposit Insurance Act, are liquidated by the Corporation through a liquidator appointed in the same manner as in the case of a national bank receivership . . . . .

12 C.F.R. § 306.1. The procedures for conduct of liquidation in the case of a national bank receivership are found in 12 C.F.R. § 306.2.

It does not appear that any reported decisions have addressed the specific question before the Court—whether the FDIC should be regarded as acting as receiver after it has taken an assignment where it is the assignor in its capacity as state-appointed receiver of a state bank.

It is clear that the FDIC routinely accepts such assignments under section 1823(e), both with regard to National Banks, see e. g., *F.D.I.C. v. Marine National Bank*, 431 F.2d 341 (5th Cir. 1970), and state banks. See, e. g., *F.D.I.C. v.*

> "if such appointment is tendered by the authority having supervision of such bank and is authorized or permitted by State law. With respect to any such insured State bank, the Corporation as such receiver shall possess all the rights, powers and privileges granted by State law to a receiver of a State bank."

Michigan permits, in fact, requires the appointment of the FDIC as receiver of insured State banks. See MSA § 23.710(251). Section 23.710(252) appears to give a receiver so appointed the authority to make the assignment:

> Subject to the approval of the appointing court, a receiver shall:
>
> (c) Sell any and all real and personal property.
>
> .    .    .    .    .
>
> (i) Borrow such sum of money as may be necessary or expedient in aiding the liquidation of the bank and in connection therewith to secure such borrowings by the pledge, hypothecation or mortgage of the assets of the bank.

*Lott,* 460 F.2d 82 (5th Cir. 1972); *F.D. I.C. v. Vineyard,* 346 F.Supp. 489 (D.Tex. 1972). However, the Court has been unable to locate any cases of an assignment in which the FDIC had been appointed receiver of the bank. Typically, in the case of a national bank, the FDIC takes the assignment of the assets from the bank directly before the bank is closed or a receiver appointed. In the reported cases in which the FDIC had taken an assignment of the assets of a closed state bank, it appears that the state courts had appointed receivers other than the FDIC.

None of these cases deal with the jurisdiction issue or interpretation of 12 U.S.C. § 1823(e).

Defendant Joseph Kristufak, the only defendant to file a response to the order to show cause, argues that the instant circumstances are analogous to those before the Court in *Federal Deposit Insurance Corporation v. National Surety Co.,* 345 F.Supp. 885 (S.D.Iowa 1972). In that case, the FDIC, as receiver of a state bank, sued the surety of the bank president in a state court. The surety removed the case to federal court. The district court granted the FDIC's motion to remand. The surety had argued that since the benefits of a successful suit by the FDIC as receiver would accrue largely to the FDIC in its capacity of insurer of the bank's deposits (since it was subrogated to the rights of the depositors) the FDIC was suing not only as receiver, but also in its corporate capacity as the party beneficially interested in the funds. The Court rejected that contention and concluded:

> The F.D.I.C. will almost always have an indirect financial interest in any litigation as receiver of a State bank where it has insured the deposits. If this indirect financial interest of the F.D.I.C. automatically created federal question jurisdiction, the intent of Congress in the above statute to limit

federal question jurisdiction would be negated.

345 F.Supp. at 888.

The Court cited two unreported federal district court decisions to the same effect. In addition, the United States Court of Appeals for the Ninth Circuit in *Hancock Financial Corp. v. Federal Savings & Loan Insurance Corp.,* 492 F.2d 1325 (9 Cir. 1974), reached the same conclusion in a case involving another, but very similar, statute regarding the Federal Savings and Loan Insurance Corporation. (12 U.S.C. § 1730(k)).[6]

There have been several cases in which courts have concluded that the FDIC can be acting in a dual capacity; that is, both as insurer of deposits and as state liquidating agent. *Freeling v. Sebring,* 296 F.2d 244 (10th Cir. 1961); *Sprowles v. Johnson,* 23 F.Supp. 63 (W.D.Okl. 1938). However, in those cases the claims sued upon clearly arose under federal law for there the depositors sued the FDIC for the insured portion of their deposits.

Two federal district courts have commented on the question of jurisdiction where the FDIC has taken an assignment of bank assets.

In *F.D.I.C. v. Cades,* 357 F.Supp. 1111 (E.D.Pa.1973), the state court had appointed the Pennsylvania Department of Banking as receiver and the Department had sold the assets of the bank to the FDIC. The issue involved in the reported opinion is not relevant to the present case; however, the Judge refers to an earlier order in the following language:

> [T]his Court by order of November 10, 1972, found that the Federal Deposit Insurance Corporation was not acting in its capacity as a receiver . . . .

357 F.Supp. at 1113.

Presumably, this order concerned a motion to dismiss by the defendant on the ground that the language of 12 U.S.C. § 1819 (Fourth) deprived the Court of

---

**6.** The Seventh Circuit has adopted a different approach which finds federal jurisdiction in cases involving the Federal Savings & Loan Insurance Corporation. See, e. g., *Katin v.* *Appollo Savings,* 460 F.2d 422 (7 Cir. 1972); *Federal Savings and Loan Insurance Corp. v. Krueger,* 435 F.2d 633 (7 Cir. 1973).

jurisdiction. The fact that the receiver in the case was the state agency makes it of limited value.

In *F.D.I.C. v. Boone*, 361 F.Supp. 133 (W.D.Okl.1972), the Court concluded: "This suit was originally instituted, and is maintained by the FDIC as original plaintiff in its own right and solely in its capacity as a Federal Corporation." 361 F.Supp. at 135. Under Oklahoma law, the State Bank Commissioner is empowered to take possession of the assets of insolvent banks and to act as liquidator. See Okla.Stat.Ann. Title 6, §§ 1202, 1204. Under Section 1205, the State Bank Commissioner may appoint the FDIC as liquidator, and the FDIC then would have all of the powers that the commissioner would have had.

It is unclear from the opinion in *Boone*, whether the Commissioner appointed the FDIC as liquidator, or assigned the assets as did the receivers in the cases discussed above. The opinion states:

On September 25, 1968, the Bank Commissioner . . . assumed and took possession of The Bank and all its assets . . . and at said time appointed the FDIC as his liquidator and agent to do and perform any act necessary to liquidate said bank and realize upon its assets. Since that date said Bank Commissioner . . . has been and remains in possession and control of said Bank for liquidation and dissolution purposes and in the cause thereof as liquidator vested in the plaintiff, FDIC, to be taken, held, owned and realized upon *as its own property*, for good, valuable and sufficient consideration on or about October 7, 1968, by and with the formal written consent and approval of the [state] District Court . . . all as provided for and authorized by the statutes of the United States of America, Title 12 U.S.C. §§ 1823(d), 1823(e), Oklahoma Banking Code of 1965.

361 F.Supp. at 135 (emphasis added).

If the FDIC was appointed liquidator, the *Boone* Court was probably incorrect in taking jurisdiction. If there was only an assignment, the case is virtually identical to *Cades*.

The problem of assignments for the purpose of creating jurisdiction has been addressed by Congress. 28 U.S.C. § 1359 states:

A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court.

While the statute does not limit its scope to devices to created diversity jurisdiction, its application has been almost entirely in that area. See generally, 7B Moore's Federal Practice § 1359, 1 Barron & Holtzoff (Wright Ed.) § 26, at 155–67, § 103, at 478–80. The prior version of the statute was occasionally relied upon for other jurisdictional (perhaps more properly, venue) purposes. See, e. g., *Southern Textile Machinery Co. v. Wovenright Knitting Co.*, 44 F.2d 234 (N.D.Ohio 1925).

The critical factor in determining whether a transfer would be accepted at face value for (diversity) jurisdictional purposes was explicated by the Fifth Circuit in *Syms v. Castleton Industries, Inc.*, 470 F.2d 1078, 1084 (1973):

[T]he courts, in determining whether an assignment is improper within the meaning of that term in 28 U.S.C.A. § 1359, give much weight to the fact, on one hand, that the assignment was bona fide and actually transferred unconditionally to the assignee what it purported to transfer, and to the fact, on the other hand, that the assignment was merely colorable and the parties did not intend that what it purported to transfer to the assignee should be in fact transferred, but should in fact remain in the assignor. An assignment having the latter effect is frequently referred to in the decided cases as a sham assignment.

The Supreme Court, faced with a transaction that in effect left the assignor with 95% of its original interest found section 1359 to be violated. *Kramer v.*

**598**

*Carribean Mills, Inc.,* 394 U.S. 823, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969).

The word "sham" is inappropriate in the instant case in view of the express provision in 12 U.S.C. § 1823(e) for the FDIC to act as both assignor and assignee. (Of course, the exact transaction described by that section would not affect the jurisdiction of the District Courts). In addition, the transaction probably does not leave the FDIC (as receiver-assignor) in a position to receive most of the benefits of the suit (and others that may be instituted), since the receivership will receive none of the proceeds until the entire amount advanced, in excess of $10 million, plus expenses and interest, is recovered. However, the assets are not "actually transferred unconditionally."

If one looks to the substance of the transactions in the instant case rather than to their form, it is clear that the FDIC proper is performing a receiver's obligation when it sues on the claims alleged here. In 12 U.S.C. § 1819, Congress has clearly expressed its intent that in performing the function of receiver of a state bank, the FDIC should use the state courts. Although there is nothing impermissible about using an assignment such as was used in the instant case to facilitate its ability to act as receiver, the FDIC, a part of the executive branch, should not be permitted to confer jurisdiction on the United States Courts by adopting the "assignment" procedure. It is the *function* which the FDIC is performing which is critical to determining the court's jurisdiction.

The FDIC's own regulations provide that upon taking such an assignment, the FDIC is to act in the same manner as when it is acting as receiver of a national bank. The FDIC took the assignment of all of the assets of the closed bank except for cash, United States government securities, and tangible property associated with the banking premises, rather than taking certain items as to which there was some special reason for unusual treatment. The FDIC is obligated to return all proceeds in excess of the amount it advanced to the Assuming Bank plus expenses.

Viewing the role of the FDIC in this case, it appears that it continues to function as receiver and, thus, the Court is without jurisdiction under 12 U.S.C. § 1819 (Fourth).

Accordingly, this action is DISMISSED FOR LACK OF JURISDICTION. Rule 12(h)(3), Federal Rules of Civil Procedure.