FEDERAL DEPOSIT INSURANCE COR-
PORATION, Plaintiff, Appellee,

v.

Manuel de JESUS VELEZ,
Defendant, Appellant.

Luis DOMINGUEZ, Plaintiff, Appellant,

v.

FEDERAL DEPOSIT INSURANCE COR-
PORATION, Defendant, Appellee.

Nos. 81–1465, 81–1625.

United States Court of Appeals,
First Circuit.

Argued Feb. 2, 1982.

Decided May 21, 1982.

Celestino Morales, Jr., San Juan, P. R., for defendant, appellant, Manuel de Jesus Velez.

Jose R. Otero, Hato Rey, P. R., with whom Otero Suro & Otero Suro, Hato Rey, P. R., was on brief for plaintiff, appellant, Luis Dominguez.

Wayne D. Baller, Washington, D. C., Senior Atty., with whom Thomas A. Brooks, Gen. Counsel, Washington, D. C., Gustavo A. Gelpi, and Feldstein, Gelpi, Hernandez & Castillo, Old San Juan, P. R., were on briefs, for Federal Deposit Ins. Corp.

Before BOWNES, Circuit Judge, GIBSON,* Senior Circuit Judge, and BREYER, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Appellants contest district court findings[1] that they are liable to the Federal Deposit Insurance Corporation (FDIC) for certain promissory notes. They had executed notes payable to the now insolvent Banco de Ahorro and had served as directors of that bank. They argue that the courts below erred in finding that agreements collateral to the notes did not relieve them of liability on the notes.

## I.  Facts

Appellants Manuel de Jesus Velez and Luis Dominguez each purchased twenty-five debentures issued by the Banco de Ahorro (the Bank) with a face value of $1,000 each, dated April 15, 1966, and due on April 15, 1976. Velez was a director of the Bank from 1966[2] until April 26, 1976, when he resigned. Dominguez became a director in 1967 and resigned on the same day as Velez. The Bank was a state bank organized under the laws of Puerto Rico and insured by the FDIC.

The debentures were not redeemed on the due date. The record does not show why the Velez debentures were not redeemed, but the record shows that the Secretary of the Treasury of the Commonwealth of Puerto Rico suggested that redemption of the Dominguez debentures be delayed. Both sets of debentures provided that the FDIC and the Secretary of the Treasury of Puerto Rico must approve payment of the principal on the debentures. Also, Puerto Rican law allows the Puerto Rican treasury secretary to suspend payment on capital debentures at their maturity. P. R. Laws Ann. tit. 7, § 1017(b) (Supp. 1979).[3] Federal law prohibits redemption of debentures without the prior consent of the FDIC. 12 U.S.C. § 1828(i)(1) (1976).[4]

---

* Of the Eighth Circuit, sitting by designation.

1.  Case No. 81–1465 was tried before the Honorable Gilberto Gierbolini-Ortiz, United States District Judge, District of Puerto Rico. No. 81–1625 was tried before the Honorable Juan M. Perez-Gimenez, United States District Judge, District of Puerto Rico. Since the same issues are involved, the cases are consolidated for purposes of an opinion.

2.  The record does not show whether Velez was a director when he purchased the debentures.

3.  Section 1017(b) reads: "The Secretary of the Treasury may suspend any payment of principal and interest on capital debentures at their maturity when such payment reduces the amount of capital stock, reserve fund and capital debentures, and when, in his judgment, said payment might affect the financial solvency of the bank and endanger the interest of the depositors and the general public."

4.  12 U.S.C. § 1828(i)(1) reads: "No insured State nonmember bank (except a District bank) shall, without prior consent of the Corporation, reduce the amount or retire any part of its common or preferred capital stock, or retire any part of its capital notes or debentures."

In the summer of 1976, several months after the due date, Velez and Dominguez made new arrangements for redemption of the debentures. The president of the Bank arranged a $25,000 loan for Velez from the Banco Obrero de Ahorro y Prestamo de Puerto Rico (Banco Obrero). This loan was due on July 9, 1977, one year from the date it was granted. In a July 9, 1976, letter, the Bank president stated that the Bank obligated itself to pay the Banco Obrero loan when it became due. The Bank loaned Velez the money to pay the Banco Obrero loan after it became due. Velez gave the Bank a note for this loan, which was secured by the debentures pursuant to the July 9, 1976, letter agreement with the Bank president. This note was due on April 15, 1981, and the letter agreement stated that the debentures' due date had been postponed to April 15, 1981. The letter agreement stated that the Bank would not attempt to collect on Velez's note to the Bank until the Bank redeemed Velez's debentures. Each party agreed to make interest payments to the other. Until 1978, Velez and the Bank were making interest payments to each other.

This arrangement allowed Velez to collect $25,000 when the debentures came due, without the prior approval of the Puerto Rican treasury secretary and the FDIC. The Bank president's letter agreement pledge not to collect on Velez's note until the debentures were redeemed would have assured Velez he would not have to come up with $25,000 if there was another delay in redemption of the debentures.

Dominguez was involved in a slightly different arrangement. After his debentures were not redeemed, the Bank gave him a $25,000 loan evidenced by a note. A letter agreement from the Bank president provided that the loan would not have to be repaid until the Bank redeemed the debentures. The debentures were security for the loan. The letter agreement stated that the Bank would collect interest on the note at the same rate as the interest earned on the debentures, although the note provided for a seven and one-half percent interest rate, while the debentures had a six percent interest rate.

Both letter agreements were kept in the personal safe of the Bank president. Neither one was made a part of the Bank's official records.

In April 1978, the Bank stopped paying interest on the debentures. On September 5, 1978, the Puerto Rican treasury secretary closed the Bank and appointed the FDIC the receiver. The notes of Velez and Dominguez were purchased by the FDIC in its corporate capacity from the FDIC as the receiver.[5] Velez and Dominguez eventually stopped making their interest payments, prompting the FDIC (as the purchaser of the notes, not as the receiver) to accelerate the notes. The FDIC brought an action against Velez to collect on the note, and Dominguez brought a declaratory judgment action against the FDIC. Velez and Dominguez argued that the letter agreements with the Bank president absolved them of liability on the notes until the debentures were paid. The district courts found Velez and Dominguez liable on the notes and denied them a right to set off the unredeemed debentures against the notes.

## II. Jurisdiction

Before addressing the merits, we will respond to Velez's argument that the district court lacked jurisdiction. Jurisdiction was based on 12 U.S.C. § 1819 (1976), which states that district courts shall have juris-

---

**5.** The FDIC can act both in its capacity as a receiver of a state bank, 12 U.S.C. § 1821(e) (Supp. II 1978), and in its corporate capacity as a purchaser of assets. 12 U.S.C. § 1823(d), (e) (1976). The propriety of the FDIC dealing with itself in these two capacities is discussed in section II.

**374**

diction over actions brought by the FDIC.[6] However, the section has an exception when the FDIC is a party in its capacity as a receiver of a state bank.[7] Therefore, if the FDIC was merely acting as a receiver, the district court would not have jurisdiction. Velez argues that the transfer of the note from the FDIC as a receiver to the FDIC in its corporate capacity was a sham transaction and in substance, if not in form, the complainant was the FDIC as a receiver. If Velez were correct, the exception to jurisdiction in § 1819 would be triggered, and the district court would be deprived of jurisdiction.

■ We agree with the district court that there was jurisdiction. The intra-FDIC transaction was not a sham. The statute expressly creates separate receiver and corporate/purchaser functions for the FDIC. The receivership function for state banks is authorized by 12 U.S.C. § 1821(e) (Supp. II 1978).[8] The FDIC is authorized to purchase assets by 12 U.S.C. § 1823(e) (1976).[9] That section authorizes, among other things, purchases of assets by the FDIC as a corporation from the FDIC as a receiver: "[T]he Corporation . . . may guarantee any other insured bank against loss by reason of its assuming the liabilities and purchasing the assets of an open or closed insured bank . . . . [T]he Corporation as receiver thereof, is authorized to contract for such sales. . . ." Also, the intra-FDIC transaction affects matters other than the jurisdiction. For instance, as a result of the transaction, any recovery upon the note would flow to the FDIC's corporate treasury. If the intra-FDIC transaction were not made, money collected by the FDIC as a receiver would flow to the receivership estate. See FDIC v. Godshall, 558 F.2d 220, 223 (4th Cir. 1977). Furthermore, several circuits have considered intra-FDIC transactions like the one involved here. They have all concluded that for purposes of jurisdiction under § 1819, the FDIC's capacity as a purchaser does not change to a receiver merely because the seller was the FDIC acting as a receiver. FDIC v. Citizens Bank & Trust Co., 592 F.2d 364, 367 (7th Cir.), cert. denied, 444 U.S. 829, 100 S.Ct. 56, 62 L.Ed.2d 37 (1979); FDIC v. Ashley, 585 F.2d 157, 160–64 (6th Cir. 1978); Godshall, 558 F.2d at 223. It seems apparent that the FDIC must be permitted to operate in a dual capacity simultaneously, as a receiver and an insurer, to carry out its functions as a receiver, liquidator, and insurer. Velez cites only one case which found the exception-to-jurisdiction section triggered an intra-FDIC transaction. FDIC v. Ashley, 408 F.Supp. 591 (E.D.Mich.1976). That decision was reversed. FDIC v. Ashley, 585 F.2d 157. We join the Fourth, Sixth, and Seventh Circuits in holding that the exception to § 1819 jurisdiction is not triggered when the FDIC in its corporate capacity is a party because it purchased assets from the FDIC in its receiver capacity.

## III.  Effect of the Collateral Agreements

■ The substantive issue in this case is whether the letter agreements provide a

---

**6.** 12 U.S.C. § 1819 reads, in pertinent part: [T]he Corporation shall become a body corporate and as such shall have power—

. . . .

Fourth. To sue and be sued, complain and defend, in any court of law or equity, State or Federal. All suits of a civil nature at common law or in equity to which the Corporation shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy . . . .

**7.** "[T]he United States district courts shall have original jurisdiction . . . except that any such suit to which the Corporation is a party in its capacity as receiver of a State bank and which involves only the rights or obligations of depositors, creditors, stockholders, and such State bank under State law shall not be deemed to arise under the laws of the United States." 12 U.S.C. § 1819(4).

**8.**  See note 5, supra.

**9.**  See note 5, supra.

defense in the FDIC's attempts to collect on the notes. We hold that the agreements are invalid for two reasons. The first is that federal law makes invalid an agreement which diminishes the FDIC's interest in an asset unless certain procedures are followed, and those procedures were not followed here. Section 1823(e), paragraph 2, of Title 12 reads:

> No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section ... shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

Of the four prerequisites for validity, there is no question that the third and fourth requirements were not followed. Dominguez stipulated that the minutes of the board of directors and of the loan committee do not mention his letter agreement, and Velez stipulated that the first reference to his agreement is found in the minutes one year after the letter agreement was executed. The agreements were kept in the Bank president's personal safe, rather than being made part of the official records. Nevertheless, appellants argue that the FDIC knew of the letter agreements and that because the Bank president was one of only two directors left after Velez and Dominguez resigned, the requirements of § 1823(e) were satisfied.

Section 1823(e) is explicit in its requirements for the validity of collateral agreements. Knowledge by the FDIC and some sort of constructive knowledge of the bank directors are not relevant.[10] The agreements do not meet the § 1823(e) requirements, and therefore the agreements are invalid.

■ Even if § 1823(e) has been followed, the agreements would be void as a matter of public policy. The agreements were intended to circumvent requirements which protect the FDIC and the interests of depositors in a closed bank.

Under the FDIC statutes, an FDIC-insured state bank must obtain the consent of the FDIC before it can retire debentures. 12 U.S.C. § 1828(i)(1) (1976).[11] The loans credited Velez and Dominguez the value of the debentures, and the letter agreements would, if valid, save Velez and Dominguez from liability on the loans. In effect, the loans and letter agreements would allow the bank to redeem the debentures without acquiring the approval of the insurer, the FDIC, and thus impair its capital structure.

The Supreme Court has made clear that agreements which avoid the requirements intended to protect the FDIC-insurer are invalid. In *D'oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed.2d 956 (1942), the Supreme Court found that the Federal Reserve Act (made part of the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811 *et seq.*, by Act of September 21, 1950, Ch. 967, § 2[1], 64 Stat. 873, 873 (1950–51)) revealed "a federal policy to protect respondent [FDIC], and the public funds which it administers" against misrepresentations of assets, 315 U.S. at 457, 62 S.Ct. at 679, or secret agreements. *Id.* at 458, 62 S.Ct. at 679. The prior approval requirements of § 1828(i)(1) are an explicit

---

**10.** Velez argues that knowledge by the FDIC is relevant to the issue of whether the FDIC is a holder in due course. We need not decide whether the FDIC is a holder in due course because the FDIC's rights under § 1823(e) are not contingent on the FDIC's holder-in-due-course status.

**11.** *See* note 4, *supra*.

effort to protect the FDIC and the funds and remaining resources of an insured bank. The Court, in *D'oench*, stated: "Public policy requires that a person who, for the accommodation of the bank executes an instrument which is in form a binding obligation, should be estopped from thereafter asserting that simultaneously the parties agreed that the instrument should not be enforced." *Id.* at 459, 62 S.Ct. at 680.

The policy espoused in *D'oench* is applicable here. The prior FDIC consent requirement of § 1828(i)(1) allows the FDIC, as insurer, to accurately assess the bank's financial condition so that the FDIC can take appropriate action. The loans and letter agreements were attempts by Velez and Dominguez to change their status from bondholders to creditors. The debentures provided for subordination in the event of insolvency to depositors and other general creditors. Section 1828(i)(1) allows the FDIC, as insurer, to make certain decisions as to the redemption of bonds and allows the FDIC to have necessary information regarding the financial relationships between the bank and its bondholders and other creditors. If the agreements were valid, the § 1828(i)(1) prior consent requirement could be circumvented, depositors' funds dissipated, and the FDIC's effectiveness as an insurer would be impaired.

### IV.  Right of Setoff

Finally, Velez and Dominguez argue that even if the agreements are invalid, they should be able to set off against the notes the face value of the unredeemed debentures. As explained above, the debentures specifically provided for subordination: "In case of receivership, conservatorship, liquidation, dissolution or winding up of the Bank, either voluntary or involuntary, payments shall be made on this Debenture and other Debentures of this or like issues after depositors and other creditors of the Bank entitled to priority, shall be paid in full." Therefore, the debts are not mutually extinguishable.

### V.  Conclusion

For the foregoing reasons, the judgments of the district courts are affirmed.