**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff, Appellee,**

v.

**LA RAMBLA SHOPPING CENTER, INC., et al., Defendants, Appellants.**

**Nos. 85–1334, 85–1785 and 85–1836.**

United States Court of Appeals, First Circuit.

Argued Feb. 4, 1986.

Submitted in No. 85–1836 Feb. 6, 1986.

Decided May 21, 1986.

here.

Jose Gandara with whom Ramon E. Bauza Higuera and Bauza & Davila were on brief for defendant, appellant La Rambla Shopping Center, Inc.

John David Ferrer with whom Victoria D. Pierce, Michael B. Burgee, Deputy Gen. Counsel, Federal Deposit Ins. Corp., and Rae Schupack, Regional Counsel, Federal Deposit Ins. Corp., were on brief for plaintiff, appellee.

Before CAMPBELL, Chief Judge, BREYER and TORRUELLA, Circuit Judges.

BREYER, Circuit Judge.

The Federal Deposit Insurance Corporation (FDIC) sued La Rambla Shopping Center, Inc. in federal district court to recover money that La Rambla owed a failed bank, namely Banco Credito y Ahorro Ponceno. The FDIC sued on the basis of a note executed by La Rambla in 1970; the note was one of Banco Credito's assets that the FDIC purchased in 1978. La Rambla filed a counterclaim, based on a shopping center lease that Banco Credito had made in 1968; the 1968 lease had nothing to do with the 1970 loan. The district court found for the FDIC on its claim on the note; it dismissed La Rambla's counterclaim on the lease. La Rambla appeals both determinations. We conclude that the district court's decisions were legally proper.

## I

We shall first discuss the most important legal question: The FDIC has sued La Rambla to collect on a note that it bought from a failed bank. Can La Rambla assert a counterclaim against the FDIC based on a separate transaction with the failed bank? We conclude that it cannot.

### A. *Background.*

To understand our conclusion one must first understand what the FDIC does when a bank threatens to fail. In those circumstances, the FDIC's basic mission is to protect insured depositors. And it can do so in several ways. First, it may wait until the bank actually fails, liquidate the assets, and pay the depositors (making up any shortfall out of its own funds). 12 U.S.C. § 1821(d)-(g). Second, it may organize a Deposit Insurance National Bank to assume the insured deposit liabilities of the failing bank. 12 U.S.C. § 1821(h). Third, it may render direct financial assistance to keep open or reopen the distressed bank by either making loans, deposits, or contributions to; purchasing assets or securities of; or assuming liabilities of the failing bank. 12 U.S.C. § 1823(c)(1). Fourth, it may enter into a "Purchase and Assumption" arrangement with the bank. 12 U.S.C. § 1823(c)(2). *See Gunter v. Hutcheson,* 674 F.2d 862, 865-66 (11th Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); Bransilver, *Failing Banks: FDIC's Options and Constraints,* 27 Ad.L. Rev. 327 (1975); Burgee, *Purchase and Assumption Transactions Under the Federal Deposit Insurance Act,* 14 Forum 1146 (1979).

Under this fourth—and usually preferred —arrangement, the FDIC as receiver of the failed bank, sells the failing bank's "good assets" along with any remaining "good will" to a healthy insured bank in return for the healthy bank's promise to pay the failed bank's depositors. The FDIC, acting as the failed bank's receiver, also formally sells its remaining "bad" assets to the FDIC itself, acting in its corporate capacity. The FDIC, in its corporate capacity, pays the FDIC as receiver, which in turn pays the healthy bank enough money to make up the difference between what the healthy bank must pay the depositors (typically a large amount) and what the healthy bank was willing to pay for the "good" assets and the "good will" (typically a smaller amount). The FDIC, in its corporate capacity, then tries to realize as much money as possible from the "bad" assets that it holds; if it realizes less than what it paid the receiver, (which paid the healthy bank), it keeps the money; if it realizes more, it pays the excess to the receiver for payment to the failed bank's creditors. Burgee, *supra* at 1154-59.

Despite its complexity, this "purchase and assumption" arrangement has at least three virtues: (1) The depositors receive their money quickly; (2) many of the failed banks' banking operations may continue without interruption; and, (3) it places the "bad" assets in the hands of an entity (the FDIC corporation) skilled at recovering as much of their potential value as possible. *FDIC v. Wood,* 758 F.2d 156, 160-61 (6th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 308, 88 L.Ed.2d 286 (1985); *FDIC v. Merchants National Bank of Mobile,* 725 F.2d 634, 638 (11th Cir.1984).

Both the FDIC's authorizing statutes and case law recognize the dual role that the FDIC often plays in respect to a failed bank. They provide the FDIC with two virtually separate, legal identities, one as a "corporation," when, for example, it buys a failed bank's assets, and another, as "receiver" of a failed bank. *FDIC v. de Jesus Velez,* 678 F.2d 371, 374 (1st Cir.1982) ("The statute expressly creates separate receiver and corporate/purchaser functions for the FDIC"); *FDIC v. Merchants National Bank of Mobile,* 725 F.2d at 638 ("FDIC as receiver contracts with FDIC in its corporate capacity to purchase the assets that are unacceptable to the assuming bank."); *FDIC v. Citizens Bank & Trust Co.,* 592 F.2d 364, 366 (7th Cir.1979) ("When acting as a receiver of a closed bank, FDIC may deal with itself. Thus it may act in two capacities, as receiver and

on its own behalf as insurer of deposits and often as a creditor."). Indeed, the very statute that allows the FDIC "to sue and be sued", specifies that all civil suits

> to which the Corporation shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy; ... except that any such suit to which the Corporation is a party *in its capacity as receiver* of a State bank and which involves only the rights or obligations of depositors, creditors, stockholders, and such State bank under State law shall not be deemed to arise under the laws of the United States.

12 U.S.C. § 1819 (Fourth). (Emphasis added.)

### B. *The counterclaim question.*

As far as we can tell, this lawsuit grows out of the FDIC's use of its preferred approach—the "purchase and assumption" arrangement. Banco Credito failed; the FDIC became its receiver; and the FDIC, in its corporate capacity, bought some of Banco Credito's assets. This lawsuit represents an effort by the FDIC, acting in its corporate capacity, to collect the value of one of those assets: the note that evidences a 1970 loan that Banco Credito made to La Rambla. The legal question that La Rambla raises in this context is whether it can assert, in federal court, a counterclaim based on a separate debt that Banco Credito allegedly owes it: additional rental payments that La Rambla claims are due under the failed bank's 1968 lease of premises at its shopping center. In light of the background we have provided, the answer to this question seems quite clearly to be "no."

La Rambla must be asserting its counterclaim *either* (1) against the FDIC acting in its corporate capacity *or* (2) against the FDIC in its capacity as receiver of Banco Credito. If it asserts the claim against the FDIC in its corporate capacity, the counterclaim fails because of a specific statute, 12 U.S.C. § 1823(e). That statute reads as follows:

> No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been continuously, from the time of its execution, an official record of the bank.

This section protects the FDIC when, as a corporation, it buys assets, say, from itself as a bank's receiver, against the risk that those assets come accompanied with liabilities that the FDIC cannot readily ascertain from its examination of the bank's books. Such protection is important. The FDIC, when considering, for example, whether to liquidate a failed bank or to structure the more desirable "purchase and assumption" arrangement, must determine whether the later arrangement is "reasonably necessary to save the cost of liquidating, including paying the injured accounts." 12 U.S.C. § 1823(c)(4)(A). It can fulfill this § 1823(c) requirement, making the "cost saving" determination with the necessary speed, only if it can rely "on the books and records of the failed bank to estimate what assets would be returned by a purchasing bank and to estimate which of those assets ultimately would be collectible." *Gunter v. Hutcheson,* 674 F.2d at 870. Without the uniform federal protective statute, § 1823(e), the FDIC might find itself subject to various, and varying, state laws—laws that would often treat the FDIC, not as a holder in due course of commercial paper, but rather as an ordinary holder or assignee of the failed bank's assets. *See* U.C.C. §§ 3–302, 3–306; 19

L.P.R.A. §§ 92, 97, 98; *Gunter v. Hutcheson*, 674 F.2d at 872. And, insofar as the law treated the FDIC as an assignee, debtors could raise various defenses, including, in some jurisdictions, claims against the bank arising out of other, unrelated transactions. *See* 6 R. Anderson, *Uniform Commercial Code* § 3–305:98 at 60 (1984) ("Whether the defendant may assert a counterclaim based on a transaction not related to the paper on which the suit is brought is to be determined by local non-Code law.") *Compare, e.g., Walla Corporation v. Banco Comercial de Mayaguez*, 114 D.P.R. 216 (1983) *with Bank of Wyandotte v. Woodrow*, 394 F.Supp. 550, 555–56 (W.D.Mo.1975). With the protection provided by § 1823(e), however, the FDIC can rely on the bank's books to make the necessary "cost saving" determination, acting expeditiously in the interest of both depositors and bank, while treating creditors such as La Rambla, at least as favorably as if the bank, for example, had sold the note reflecting the loan to another bank that was a "holder in due course." *Gunter v. Hutcheson*, 674 F.2d at 872.

■ In light of the FDIC's need for uniformity, speed, and a sound judgment, it is not surprising that Congress limited the agreements that a debtor might raise as defenses to a FDIC claim based upon a purchased asset, to those agreements which are (1) in writing, (2) executed by the bank and the debtor "contemporaneously with the acquisition of the asset by the bank," (3) approved by the directors or loan committee, which approval is reflected in the minutes, and (4) contained in an official bank record. In this instance, the agreement that is the subject of La Rambla's counterclaim fails to meet requirement (2). It was not executed "contemporaneously" with the note that evidences the 1970 loan; it was executed, according to La Rambla, in 1968, two years before. Hence, given 12 U.S.C. § 1823(e), it cannot constitute a defense or the subject of a counterclaim against the FDIC, acting in its corporate capacity.

We therefore turn to the alternative possibility: that La Rambla is suing the FDIC as *receiver* of Banco Credito. Such a suit amounts to an assertion by La Rambla of its claim against the bank itself. That is to say, it can sue the bank alleging that the bank owes it money under a 1968 shopping center lease; and, since the bank is in the hands of the receiver, it can sue that receiver. That receiver, however, even though it is the FDIC, is not a party to this lawsuit; and we do not see how it can be made a party in respect to La Rambla's counterclaim.

■ There is no "arising under" jurisdiction. 28 U.S.C. § 1331. The jurisdictional statute we have previously quoted, p. 219, *supra*, specifically states that a suit like this one, between a creditor and the FDIC as a receiver, "shall not be deemed to arise under the laws of the United States." 12 U.S.C. § 1819 (Fourth); *FDIC v. de Jesus Velez*, 678 F.2d at 374 ("[I]f the FDIC was merely acting as a receiver, the district court would not have jurisdiction."). And, in order to treat this claim as "pendent" or "ancillary" (as La Rambla argues), we should have to treat the FDIC in its corporate capacity and the FDIC as receiver as a single entity, called the "plaintiff in this lawsuit," which we shall not do. *See Pioche Mines Consol., Inc. v. Fidelity-Philadelphia Trust Co.*, 206 F.2d 336, 337 (9th Cir.1953) ("[A] counterclaim against a trustee in his individual capacity, where he was sued as a fiduciary only, is not permissible inasmuch as it is not a counterclaim against an 'opposing party' as contemplated by Rule 13.") We should also have to deviate from the ordinary rule that a defendant can assert in a federal court a "permissive counterclaim" only if "there is some independent jurisdictional base such as federal question upon which federal jurisdiction may be founded." *McCaffrey v. Rex Motor Transportation, Inc.*, 672 F.2d 246, 248 (1st Cir.1982). While some courts have read into this latter rule an exception for a "defensive setoff," *i.e.*, allowing a defendant to assert virtually any permissive counterclaim up to the amount that the plaintiff successfully obtains on his main

claim, *Ambromovage v. United Mine Workers,* 726 F.2d 972, 988 (3d Cir.1984); 3 J. Moore, *Moore's Federal Practice* ¶ 13.-91[1] (2d ed. 1983), to apply any such exception here would be to ignore the policies underlying § 1823(e), *see* pp. 219–20.

La Rambla does not claim the existence of "diversity jurisdiction," 28 U.S.C. § 1332, and, for good reason since the federal courts have uniformly denied it. *See, e.g., FDIC v. Sumner Financial Corp.,* 602 F.2d 670, 677 (5th Cir.1979) (section 1823(e) implicitly forbids suit against FDIC as receiver brought under general grant of jurisdictional authority, such as statute providing for diversity jurisdiction). *FDIC v. National Surety Corp.,* 345 F.Supp. 885, 887–88 (S.D.Iowa 1972) (no diversity jurisdiction in suit against FDIC as receiver because FDIC, as a federally chartered corporation, is not 'citizen of a state'). *See Federal Intermediate Credit Bank of Columbia, S.C. v. Mitchell,* 277 U.S. 213, 214, 48 S.Ct. 449, 450, 72 L.Ed. 854 (1928) (state citizenship does not result from the mere creation of a corporation under federal law); *Hancock Financial Corp. v. FSLIC,* 492 F.2d 1325, 1329 (9th Cir.1974); *Burton v. United States Olympic Committee,* 574 F.Supp. 517, 519–20 (C.D.Calif.1983). *But cf. Garden Homes, Inc. v. Mason,* 238 F.2d 651 (1st Cir.1956) and 249 F.2d 71 (1st Cir.1957), *cert. denied,* 356 U.S. 903, 78 S.Ct. 562, 2 L.Ed.2d 580 (1958).

Since section 1823(c) bars a counterclaim against the FDIC as corporation, and there is no jurisdictional base for a claim against the FDIC as receiver, we conclude that the district court properly dismissed La Rambla's counterclaim.

## II

We turn now to La Rambla's more fact-specific arguments.

1. La Rambla attacks various of the district court's factual findings as inadequately supported by the record. In particular, the district court found that La Rambla borrowed $350,000 from the bank in September 1970. It also found (1) that La Rambla promised to repay the loan in fixed monthly "principal plus interest" payments (which from June 1972 amounted to $5,000 each); (2) that La Rambla promised to pay any outstanding balance on demand by the bank; (3) that the bank would set the interest rate, which might vary from time to time; (4) that, after August 1977, the parties agreed to set a definite interest rate of 'prime rate plus 3 percent with a floor of 10.5 percent'; and (5) that La Rambla stopped making payments after September 8, 1978.

In challenging these findings, La Rambla relies primarily on testimony by its own president, who said that the loan was for a fixed term and carried a fixed interest rate of 9.5 percent. The directors' minutes of the meetings in which the loan was approved also support a claim of fixed rate, for they say "[t]his Increase [in the previous line of credit, i.e., the loan at issue in this case] is hereby approved to the established credit with a 10% interest rate."

■ There was considerable evidence, however, to the contrary. This evidence included: (1) the note itself (see Appendix for text) which says that it is "due on demand," and "payable on presentation," and which leaves the interest rate blank (but sets a 10 percent rate for overdue payments); (2) testimony by two bank officers, Jose Blasini and Juan Vicens, (who administered and supervised the loan) that the loan was due on demand, that the bank could make periodic adjustments to the interest rate, that La Rambla promised to repay the loan in fixed monthly payments, and that the bank frequently loaned money on similar terms; (3) documents showing that the bank notified La Rambla in advance on the several different occasions when it changed the interest rate; (4) testimony and documentary evidence that La Rambla's president went to see Juan Vicens, credit supervisor, vice-president, and branch manager of the bank; stated his disagreement with the increase in the interest rate; heard Vicens refer to the need for a written claim; but nonetheless continued to make monthly payments without taking any further steps towards obtaining the

bank's compliance with what, according to his testimony, was a guaranteed 9.5 percent rate.

This evidence provides more than adequate support for virtually all the district court's conclusions, particularly in light of the specific provisions of Puerto Rico's Civil Code, which in instances of ambiguity, requires a court to find the terms of a contract by looking at the parties' intent, Puerto Rico Civil Code art. 1233, 31 L.P.R.A. § 3471, allows it to find intent in light of the parties' "contemporaneous and subsequent" acts, Puerto Rico Civil Code art. 1234, 31 L.P.R.A. § 3472, and tells the court to interpret the contract in light of "usage and custom," Puerto Rico Civil Code art. 1239, 31 L.P.R.A. § 3477. That is to say, given the district court's power to determine credibility, its decision to credit the testimony of the bank officers Jose Blasini and Juan Vicens, and the other evidence to which we refer, the court's basic findings are not "clearly erroneous." Fed. R.Civ.P. 52(a).

■ La Rambla's strongest evidentiary claim on this appeal concerns a subsidiary finding, namely, the finding that the parties agreed to a definite interest rate (prime rate plus 3 percent with a 10.5 percent floor) to be charged after September 1977. The evidence favoring the existence of this subsidiary agreement consists of a request by La Rambla for a lower rate at a time when the bank was charging it 12.5 percent though the prime rate was 6.75 percent, and a notation by Juan Vicens on an internal memorandum of the Bank "Recommend be accepted at 3/p, floor 10½%." Though there was no evidence that the bank accepted Vicens' recommendation, the district court evidently believed it "more probable than not" that it did so.

La Rambla says that "[t]here is no record at all to show whether the rate of interest charged by Banco Credito after October of 1973, had any relationship to any 'prime interest'". Taking La Rambla's words at face value—that, aside from Vicens' recommendation, the record contains no particular evidence one way or the other—we think Vicens' recommendation is enough to support the district court's finding of the later subsidiary agreement; the finding is not "clearly erroneous."

■ 2. La Rambla argues that the note that the FDIC received is not evidence of the loan at issue. Rather, it says, the note was a kind of pledge that the bank kept as a sort of collateral for use if La Rambla defaulted on the 'true loan,' which, it adds, ran for a term of months at an interest rate of 9.5 percent. Whatever the merits of this argument, we do not consider it, for La Rambla did not raise it in the district court. *Johnston v. Holiday Inns, Inc.*, 565 F.2d 790, 797 (1st Cir.1977).

■ 3. La Rambla seems to argue at one point in its brief that the district court's interpretation of the agreement would make the agreement invalid. Under Puerto Rico's law, the "validity and fulfillment of contracts cannot be left to the will of one of the contracting parties." Puerto Rico Civil Code, art. 1208, 31 L.P.R.A. § 3373. Yet, says La Rambla, in the court's view the determination of the interest rate, a key term, would be left up to the bank. In fact, however, whether or not La Rambla would have to pay any particular rate was up to both parties, not just one. The bank gave La Rambla advance notice of any change in rates. If La Rambla did not wish to pay a higher rate, it was free to return the balance of the loan. The higher rate took effect only if *both* the bank *and* La Rambla decided to continue the loan at the new rate. We are aware of no authority that would interpret art. 1208 of the Civil Code to forbid banks from engaging in what seems to be a common practice, namely the lending of money payable on demand with fluctuating interest rates.

■ 4. La Rambla says that the bank's charged interest rate at times exceeded the maximum permitted under Puerto Rico's usury law. Puerto Rico Civil Code, arts. 1649, 1652, 31 L.P.R.A. §§ 4591, 4594; Law No. 1 of Oct. 15, 1973, §§ 1-3, 10 L.P.R.A. §§ 998–998b. The law, however, specifically exempts loans to corporations. General

Laws on Corporations, art. 1206, 14 L.P. R.A. § 2206; *Mansiones de Park Gardens, Inc. v. Scotiabank,* 114 D.P.R. 513 (1983). La Rambla seems to claim that the exemption does not apply where the interest rate is not in writing; but nothing in the usury statute so limits the exemption. The statute simply says "[i]n a suit filed to demand payment of any ... promissory note ... assumed by a corporation, the latter may not allege as a defense any legislation whatsoever against usury"; and La Rambla provides no convincing reason why we should interpret the statute other than according to its terms.

5. La Rambla makes several arguments in respect to the calculation of the amount of the judgment. First, it says that it never received the full $350,000, for Banco Credito initially withheld about $13,000 which apparently La Rambla owed on another loan. We shall not investigate the merits of this argument, however, for it was not made in the court below. *Johnston v. Holiday Inns, Inc., supra.*

Second, La Rambla attacks the FDIC's calculation of the amount of principal owed and interest due between September 1978 (when La Rambla stopped paying) and December 1982, when the FDIC filed suit. It says that the FDIC's figure for principal is higher than that shown on the books of the bank itself. This argument has a degree of intuitive appeal, but, despite our uncertainty about the FDIC's calculations, we conclude that La Rambla did not adequately call the district court's attention to this problem. It simply presented that court with a set of alternative calculations without any relevant explanation about *why* they differed from the FDIC's apparently comparable calculations. We do not see how the trial judge could be expected to uncover the problems underlying the FDIC's calculations on his own. Under these circumstances, it would be unfair to allow La Rambla to raise this point on appeal, and we consider this argument to have been waived. *Nathan Rodgers Construction & Realty Corp. v. City of Saraland,* 676 F.2d 162, 163 (5th Cir. Unit

B 1982) ("Absent plain error we would not reverse the district court on an issue not clearly presented to it for decision."); *Laketon Asphalt Refining, Inc. v. United States Department of Interior,* 624 F.2d 784, 788 (7th Cir.1980) ("Laketon did not expressly raise the ... argument in the district court, ... it did nowhere advance the specific ... argument advanced here. Even viewing the pleading in the light most favorable to plaintiff, we find it difficult to see how the district court could have considered the argument."); *Johnston v. Holiday Inns, Inc., supra.*

La Rambla next says that the record lacks evidence of what the 'prime rate' was; hence there is no way to calculate interest due after September 1977 when the agreed upon rate was 'prime rate plus 3 percent with a 10.5 percent floor.' There is testimony and documentary evidence, however, that the prime rate used by Banco Credito was the same one used by the Chemical Bank of New York.

6. La Rambla, in a separate appeal, says the court should have reopened the case under Rule 60(b) to receive new evidence. The "new evidence" consists of (1) a 1970 memo from the bank's assistant vice-president, Jose Blasini, to its executive vice-president discussing the proposed loan to La Rambla, and (2) a report of a 1975 meeting between La Rambla's president and Juan Vicens, the vice president of the bank. We do not see how the first of these items could help La Rambla, for it concludes "I expect your instructions concerning ... the rate of interest to be charged on this debt." The second reports that La Rambla's president said he had agreed with the bank "to consolidate all his current debts into one obligation and establish a payment plan at a rate of interest which he claims was 9 percent." The memo makes clear that its writer disagrees; and it adds that "he complained verbally about the changes in interest but never did it in a formal way and in writing." The memo is thus, at best, cumulative evidence of a fact that the trial court accepted, namely, that La Rambla's president complained twice

about the interest increases. The district court did not abuse its discretion in refusing a new trial.

7. La Rambla also separately appeals the district court's award of attorneys' fees, as provided by the note itself. Its sole argument is that the original judgment in this case did not provide for attorneys' fees, and, the FDIC's motion to amend the judgment was not timely. Assuming, purely for the sake of argument, that to obtain fees a Rule 59(e) motion to amend judgment is necessary, La Rambla's appeal nonetheless fails because the FDIC's motion was timely. The judgment, though dated March 29, 1985, was not entered on the docket until April 1, 1985; only then was it final and effective. Fed.R. Civ.P. 58. The FDIC's motion for attorneys' fees was served by mail on April 10, 1985. That date was within ten days of "the entry of judgment." Fed.R.Civ.P. 59(e).

The judgments of the district court in these three appeals are

*Affirmed.*

### APPENDIX

The heading and the first paragraph of the note are as follows:

BANCO CREDITO Y AHORRO PONCENO
NOTE WITH COLLATERAL GUARANTEE

Due: __DEMAND__

No. _____   $ __$350,000.00__

FOR VALUE RECEIVED, the undersigned, jointly and severally, bind themselves to pay to the order of BANCO CREDITO Y AHORRO PONCENO (hereinafter the BANK) at its offices in the city of __Ponce__, Puerto Rico, the sum of __Three hundred fifty thousand dollars__ ($350,000) on __its presentation__ with interest at the rate of _____% annually, said interest being payable __monthly__ at the interest rate of __10__% annually in case of delinquency, as well as costs, disbursements and legal fees in case of a judicial or extrajudicial claim.